**Richard BRASKETT, Plaintiff,**

v.

**Celeste FENDER and Nathan Tobey, Defendants.**

**No. 03:11–cv–01078–HU.**

United States District Court, D. Oregon, Portland Division.

Aug. 3, 2012.

Kevin Keaney, Kevin Keaney, P.C., Portland, OR, for Plaintiff.

Jennifer Johnston, Deputy City Attorney, Robert Yamachika, Deputy City Attorney, Office of City Attorney, Portland, OR, Attorneys for Defendants.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

HUBEL, United States Magistrate Judge:

The plaintiff Richard Braskett brings this action under 42 U.S.C. § 1983, for alleged violations of his constitutional rights by the defendants, in connection with events that occurred in April 2010. The defendant Celeste Fender is a Detec-

tive with the Portland Police Bureau ("PPB"), and the defendant Nathan Tobey is a PPB Officer. At the time of the incidents in question, both Fender and Tobey were assigned to the PPB's Domestic Violence Reporting Unit ("DVRU"). Braskett's claims in this case involve the defendants' contacts with Braskett's wife Barbara Braskett ("Mrs. Braskett"), and the defendants' search of the Brasketts' residence on April 13, 2010. Braskett asserts a single claim for relief, alleging the defendants' actions on the date in question violated Braskett's "right to be free of unreasonable search and seizure under the Fourth Amendment and 42 USC 1983." Dkt. # 27, Amended Complaint, ¶ 8.

The case currently is before the court on the defendants' Motion for Summary Judgment. Dkt. # 30. The defendants argue they are entitled to judgment as a matter of law on Braskett's claim. The motion has been briefed fully by the parties, and the court heard oral argument on the motion on July 9, 2012.

### *BACKGROUND FACTS*

The following facts are uncontroverted, unless otherwise noted.

Mr. Braskett and Mrs. Braskett jointly purchased their current residence in Vancouver, Washington, and they both are named on the title to the property.[1] In April 2010, Mrs. Braskett reported verbal abuse by Mr. Braskett to a family friend, who is a former PPB reserve police officer.[2] On or around April 12 or 13, 2010, Mrs. Braskett asked Mr. Braskett to move out of the family home. Mrs. Braskett remained in the house with their two chil-

---

1. Declaration of Jennifer Johnston ("Johnston Decl."), Ex. 2, Deposition of Barbara Braskett, ("B. Braskett Depo.") 48:14–19.

2. Ex. 2, B. Braskett Depo. 18:9–19:9.

dren.[3]

On the night of Monday, April 12, 2010, Detective Celeste Fender and Officer Nathan Tobey went to the Braskett residence to investigate an allegation of domestic violence and prescription drug abuse by Mr. Braskett.[4] Detective Fender attempted to call the Braskett residence phone and knocked on the door on numerous occasions, but there was no answer to either.[5]

On Tuesday, April 13, 2010, Fender and Tobey returned to the Braskett residence to make contact with Mrs. Braskett. They identified themselves as PPB officers and members of the DVRU, stating they were there to talk to Mrs. Braskett about her husband, Mr. Braskett, and to make sure that Mrs. Braskett and the children were okay.[6]

Mrs. Braskett invited Fender and Tobey into her home, and they talked at the kitchen table.[7] At the time of inviting Fender and Tobey into the Braskett residence, Mrs. Braskett was aware that one of the subjects about which the officers wanted to talk to her was Mr. Braskett's use of alcohol and other drugs.[8]

They talked, at the kitchen table, about the safety of Mrs. Braskett and the children, and about giving Mr. Braskett any assistance that he might need.[9] Mrs. Braskett was relieved to talk to somebody from the PPB.[10] She talked about the stress which both she and her husband were under. Mr. Braskett's stress stemmed from an incident which happened a few years ago.[11] Mrs. Braskett was concerned that this stress was causing Mr. Braskett to overuse prescription medication.

Both Mrs. Braskett and Mr. Braskett had prescriptions for painkiller medication.[12] Mrs. Braskett thought Mr. Braskett's doctor was prescribing excessive amounts of medication, and when Mr. Braskett's medication ran out, he would take Mrs. Braskett's medication. Mrs. Braskett was also concerned that Mr. Braskett was consuming more alcohol than usual, and he had become verbally abusive towards her.[13] Mrs. Braskett began hiding her medication from Mr. Braskett so that he could not take hers.[14]

Mrs. Braskett clearly stated that while Mr. Braskett had become increasingly verbally abusive towards her, he had never been physically violent towards her or the children.[15] Mrs. Braskett said the situa-

3. Johnston Decl. Ex. 1, Deposition of Richard Braskett, ("R. Braskett Depo.") 31:19–23; Ex. 2, B. Braskett Depo. 69:20–70:24.

4. Memo in Supp. of Defs.' Motion Summ. J., at 2.

5. Johnston Decl. Ex. 3, Deposition of Celeste Fender Volumes I and II ("Ex. 3, Fender Depo.") 34:18–35:8.

6. Ex. 2, B. Braskett Depo. 77:4–22; Ex. 3, Fender Depo. 57:22–58:5; Johnston Decl. Ex. 4, Deposition of Nathan Tobey, ("Tobey Depo.") 4:14–18; 6:16–19.

7. Ex. 2, B. Braskett Depo. 77:18–79:6; Ex. 3, Fender Depo. 58:5–7.

8. Ex. 2, B. Braskett Depo. 18:2–19:4.

9. Ex. 2, B. Braskett Depo. 79:7–15.

10. Ex. 2, B. Braskett Depo. 127:8–15; 130:8–19; Ex. 4, Tobey Depo. 19:2–3.

11. Ex. 4, Tobey Depo. 18:4–8.

12. Ex. 4, Tobey Depo. 18:18–19.

13. Ex. 2, B. Braskett Depo. 79:22–80:14; Ex. 3, Fender Depo. 68:7–11; Ex. 4, Tobey Depo. 18:10–11.

14. Ex. 2, B. Braskett Depo. 89:14–19; Ex. 4, Tobey Depo. 18:18–22.

15. Ex. 2, B. Braskett Depo. 79:16–21; Ex. 3, Fender Depo. 61:21–62:1; Ex. 4, Tobey Depo. 8:10–13.

tion had been causing her stress, and she had been seeking help for some time.[16]

In April 2010, Mrs. Braskett was teaching the fourth grade, and one of her students had thrown a chair at her, which caused her additional stress.[17] Mrs. Braskett told Fender and Tobey about the incident, and that she was taking sleeping pills as a result of the stress it had caused her.[18] Mrs. Braskett also had a painful shoulder injury at the time, and so she was taking a pain reliever/ sleeping agent.[19]

Tobey does not recall Mrs. Braskett talking about incidents in her classroom, but does recall Mrs. Braskett informing the officers that she had taken sleeping pills the night before, and that was why she had not answered the door.[20]

Mrs. Braskett recalls Fender and Tobey specifically asking whether there were any firearms in the house.[21] Mrs. Braskett communicated her concerns about Mr. Braskett's firearms around the house, as their children might be able to access them, and she asked Fender and Tobey to secure the firearms.[22] Mrs. Braskett led Fender and Tobey to the master bedroom, informed Fender and Tobey that Mr. Braskett kept a gun in the dresser, and

asked them to remove the gun. Tobey removed the gun.[23] Tobey assumed that Mrs. Braskett had access to the dresser.[24] Mrs. Braskett allowed Tobey to unload the ammunition from the gun.[25] Fender did not enter the dresser to remove the gun, and did not touch the gun at any stage.[26]

Mrs. Braskett did not want the gun in the house, so she opened a combination lock gun safe in the garage. Officer Tobey placed the gun in the gun safe at Mrs. Braskett's request.[27]

Mrs. Braskett was concerned about the light on the front porch not working, so Fender and Tobey went to a nearby store and purchased a new light bulb. Tobey installed the new light bulb.[28]

Mrs. Braskett claims she was assured on numerous occasions that the information which she imparted to Fender and Tobey would remain confidential between the three of them. Mrs. Braskett was aware that Fender and Tobey were from the DVRU; however, she believed their conversations would remain confidential because there was no allegation of physical abuse by Mr. Braskett towards Mrs. Braskett or their children.[29] Tobey does

---

16. Ex. 2, B. Braskett Depo. 82:14–20; Ex. 4, Tobey Depo. 18:23–19: 3.

17. Ex. 2, B. Braskett Depo. 33:4–20.

18. Declaration of Kevin Keaney ("Keaney Decl.") Ex. 1, B. Braskett Depo., ECF p. 38.

19. Keaney Decl., Ex. 1, B. Braskett Depo. ECF p. 40.

20. Ex. 4, Tobey Depo. 19:4–17.

21. Ex. 2, B. Braskett Depo. 95:16–96:23.

22. Ex. 3, Fender Depo. 72:13–16; 75:20–22.

23. Ex. 2, B. Braskett Depo. 97:7–13; Ex. 4, Tobey Depo. 23:20–24:5.

24. Ex. 4, Tobey Depo. 27:8–28:6.

25. Ex. 2, B. Braskett Depo. 97:11–16; 156:10–12; Ex. 3, Fender Depo. 73:1–4.

26. Declaration of Celeste Fender ¶ 3 ("Fender Decl."); Ex. 3, Fender Depo. 72:12–21; 73:13–20; 79:7–12.

27. Ex. 2, B. Braskett Depo. 97:17–98:2; Ex. 3, Fender Depo. 73:13–15; Ex. 4, Tobey Depo. 24:13–14.

28. Keaney Decl. Ex. 1, B. Braskett Depo. 95:2–11; Ex. 4, Tobey Depo. 32:10–19.

29. Ex. 2, B. Braskett Depo. 127:16–22; Keaney Decl. Ex. 1, B. Braskett Depo. 127:16–129:24 (ECF pp. 33–34).

not remember Mrs. Braskett asking whether their conversation would remain confidential.[30]

According to Fender, she called Mrs. Braskett on April 14, 2010, informing her that the PPB wanted to ensure Mr. Braskett had his own prescription, and they arranged for Fender and Tobey to go to the house after Mrs. Braskett finished work.[31] Mrs. Braskett does not recall any such phone call.[32] Fender and Tobey arrived at the Braskett residence shortly after 4:00 p.m.[33] When Mrs. Braskett arrived home from work with her children, she invited Fender and Tobey inside the Braskett residence.[34]

Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's medication bottles.[35] Mrs. Braskett returned upset, and informed Fender and Tobey that Mr. Braskett had been in the house during the day, and had cleaned up and disposed of some prescription medication bottles, even though Mrs. Braskett had asked Mr. Braskett not to enter the house.[36]

Mrs. Braskett obtained prescription bottles[37] from Mr. Braskett's medicine cabinet in the master bathroom and showed them to Fender. Fender copied information from the label onto a piece of paper, but she did not remove the prescription bottles that came from the medicine cabinet from the Braskett residence.[38] Mr. Braskett's prescription Vicodin bottle was not in the medicine cabinet, and so was not part of the bottles which Mrs. Braskett retrieved from that location and showed to Fender.[39] Neither Fender nor Tobey entered the master bedroom or en-suite bathroom on April 14, 2010.[40]

Mrs. Braskett determined that Mr. Braskett had cleaned up because she knew one of Mr. Braskett's empty prescription bottles had been in the computer room, but was no longer there, and the wastebasket[41] in the computer room had been emptied.[42]

The garbage had been picked up on that day, and either Mrs. Braskett or her son had brought the garbage can from the street back to the garage earlier that afternoon.[43] Mrs. Braskett discovered that there was still something in the garbage

30. Ex. 4, Tobey Depo. 19:22–24.

31. Ex. 3, Fender Depo. 98:23–99:23.

32. Ex. 2, B. Braskett Depo. 98:22–25.

33. Ex. 3, Fender Depo. 101:5–12; Ex. 4, Tobey Depo. 34:18–22.

34. Ex. 2, B. Braskett Depo. 100:4–5; Ex. 3, Fender Depo. 101:5–22; Ex. 4, Tobey Depo. 34:22–24.

35. Ex. 3 Fender Depo. 102:10–11; Ex. 4 Tobey Depo. 35:3–10.

36. Ex. 3 Fender Depo. 102:14–19: Ex. 4 Tobey Depo. 35:2–10, 41:8–10.

37. For the purposes of clarity, "prescription bottles" refers exclusively to Mr. Braskett's medication bottles.

38. Ex. 2, B. Braskett Depo. 101:8–102:2; 103:16–104:4.

39. Ex. 2, B. Braskett Depo. 106:25–107:2.

40. Ex. 2, B. Braskett Depo. 101:14–24; Declaration of Nathan Tobey ("Tobey Decl.") ¶¶ 3–6; Fender Decl. ¶ 4.

41. For the purposes of clarity, "wastebasket" refers exclusively to the one in the computer room.

42. Ex. 2, B. Braskett Depo. 106:16–24; 159:13–19.

43. For the purposes of clarity, "garbage can" refers exclusively to the household garbage can. (Mrs. Braskett describes it as a "big blue thing, with a lid on wheels." Ex. 2, B. Braskett Depo. 102:17.) It is placed at the curb for periodic pickup by the garbage service.

can, either when her son retrieved the garbage can from the street and Mrs. Braskett closed the lid, when she was retrieving the garbage can from the street herself she realized there was still garbage inside the garbage can, or when she realized the wastebasket in the computer room had been emptied.[44]

Mrs. Braskett led Fender and Tobey to the garage to check the garbage can for medication bottles which had been put in the garbage can that day.[45] According to Tobey, Mrs. Braskett opened the lid to the garbage can.[46] Fender does not recall who opened the garbage can.[47] The garbage can contained a clear plastic garbage bag, and one could clearly see that it contained Vicodin bottles.[48] Mrs. Braskett said the bag contained what Mr. Braskett had cleaned up during the day.[49]

Mrs. Braskett offered to get an umbrella with a hook so that she could retrieve the garbage bag.[50] Fender did not retrieve the bag.[51] Tobey does not remember who removed the bag from the garbage can, but believes that Mrs. Braskett opened the garbage bag and handed the bottles to Fender.[52] Mrs. Braskett recalls Tobey reaching into the garbage can, removing the bag of prescription bottles from the garbage can, opening the bag, and removing the prescription bottles from the bag.[53]

Fender does not recall whether she physically handled the bottles at the Braskett residence, but when Fender and Tobey left the Braskett residence, they took the empty medication bottles with them.[54]

## SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles,* 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996)). The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-

---

44. Ex. 2, B. Braskett Depo. 102:4–21; 104:5–105:24; 106:7–107:60; 159:13–19.

45. Ex. 4, Tobey Depo. 42:1–6.

46. Ex. 4, Tobey Depo. 35:14–19.

47. Ex. 3, Fender Depo. 103:22–104:1.

48. Ex. 2, B. Braskett Depo. 159:21–24; Ex. 3, Fender Depo. 103:14–21; Ex. 4, Tobey Depo. 35:14–19.

49. Ex. 4, Tobey Depo. 35:18–19.

50. Ex. 2, B. Braskett Depo. 160:4–22.

51. Ex. 3, Fender Depo. 103:24–104:1.

52. Ex. 4, Tobey Depo. 35:14–17; 36:17–22; 42:20–43:3; 49:25–50:2.

53. Ex. 2, B. Braskett Depo. 107:12–20; 159:25–160:22.

54. Ex. 3, Fender Depo. 104:9–13.

moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S.Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir.2010).

### DISCUSSION

In the Amended Complaint, Braskett brings this 42 U.S.C. § 1983 claim alleging the defendants breached his Fourth Amendment rights by entering the Braskett residence without his consent, and conducting a search without a warrant or exigent circumstances. Specifically, Braskett contends that in the course of the search, the defendants violated his Fourth Amendment rights by searching his medicine cabinet, taking medical records, going through the garbage, and retrieving a handgun from the dresser.[55] In the face of the defendants' assertion that Mrs. Brask-

ett consented to the search, Mr. Braskett contends that, at the time, Mrs. Braskett did not have the capacity to consent.

In addition, the defendants claim that even if Braskett could show his constitutional rights were violated, the defendants are entitled to summary judgment because qualified immunity shields them from liability. The defendants seek summary judgment on all of Mr. Braskett's claims.

### Burden of Proving Incapacity

The parties dispute whether the burden of proving Mrs. Braskett's capacity to consent to a search falls upon the defendants, as the state actors, or must be carried by Mr. Braskett, as the civil plaintiff. Mr. Braskett challenges the officers' reliance on Mrs. Braskett's consent, claiming she was too tired and too stressed to be able to make a voluntary decision to consent. He makes this argument with respect to each alleged constitutional violation.

Mr. Braskett alleges the government always has the burden of proving the existence of consent, citing *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990).[56] The defendants respond that *Shaibu* is a criminal case, and is inapplicable to this § 1983 claim.[57] The defendants allege Mr. Braskett carries the burden of proving lack of consent, citing Ninth Circuit authority.

> [In] a criminal case, the government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. In a civil case under 42 U.S.C. 1983, however, the plaintiff carries the ultimate burden of establishing each element of his or her claim, including lack of consent.

---

**55.** Johnston Decl., Ex. 1, R. Braskett Depo. 34:8–15.

**56.** Pl.'s Opp'n to Defs.' Mot. Summ. J., at 8.

**57.** Reply in Supp. of Defs.' Mot. for Summ. J., at 5.

*Pavao v. Pagay,* 307 F.3d 915, 918–19 (9th Cir.2002).

In *Larez v. Holcomb,* 16 F.3d 1513 (9th Cir.1994), the plaintiff brought a § 1983 action against police officers for wrongful detention. Larez was seized by officers and detained for questioning in connection with a murder investigation in which her brother was a suspect. Larez claimed she thought she was under arrest; she was taken to the police station and held, in handcuffs, for two hours; and she neither consented to be questioned, nor responded to officers' questions. The officers told a different story, claiming Larez was cooperative from the beginning; she consented to being taken to the police station for questioning; and she never was handcuffed. The court held that while the burden of producing evidence of consent may be placed on the defendant, the risk of nonpersuasion remains with the plaintiff, who always has the burden to prove a violation of the Fourth Amendment. *Larez,* 16 F.3d at 1517 (citing *Ruggiero v. Krzeminski,* 928 F.2d 558, 563 (2d Cir.1991)). *See also, e.g., Bogan v. City of Chicago,* 644 F.3d 563, 570 (7th Cir.2011) (employing a "criminal burden of proof is contrary to established principles governing civil trials, namely, that 'the ultimate risk of nonpersuasion must remain squarely on 12 the plaintiff' ") (citations omitted); *Valance v. Wisel,* 110 F.3d 1269, 1279 (7th Cir.1997) (in a civil case, defendant must offer evidence to meet or rebut the presumption that a warrantless search is unreasonable, but plaintiff must prove consent was not given or was invalid) (citing, *inter alia,* Fed.R.Evid. 301).

■ While *Larez* was a § 1983 case, that court did not consider the issue of a third party's consent. Having examined the case law surrounding § 1983 claims, it would appear that the issues arising in this case are somewhat unique. Neither counsel for the plaintiff, nor the defendants, has made known to the court any case which concerned a § 1983 claim alleging a violation of the Fourth Amendment, where the plaintiff challenged the capacity of a third party to consent, after the § 1983 defendants relied on that third party's consent to justify their search. I note the defendants here plead the consent of Mrs. Braskett as an affirmative defense to avoid the § 1983 claim of a constitutional violation. *See* Fed.R.Civ.P. 8(c)(1) (requiring a party to state a matter of avoidance as an affirmative defense). On these facts, it seems appropriate that Braskett must prove he did not consent to any search, but if the defendants want to avoid a constitutional violation by relying on Mrs. Braskett's consent, they should have the burden of proving its validity. However, resolution of who has this burden is not essential in deciding this motion for summary judgment. To avoid summary judgment, Braskett is required to raise a material question of fact about the capacity of Mrs. Braskett to consent to a search of the Braskett residence. I turn to that issue.

■ "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Garcia,* 997 F.2d 1273, 1281–82 (9th Cir.1993) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973)). Both parties agree that this holistic standard is the proper test in the instant case.[58] Braskett claims that all of the factors weighing upon Mrs. Braskett on the night of April 13, 2010, made her incapable of consenting. The defendants assert the factors weighing upon Mrs.

---

58. Reply in Supp. Defs.' Mot. Summ. J., at 10; Pl.'s Opp'n to Defs.' Mot. Summ. J., at 8.

Braskett that night were not sufficiently incapacitating so as to prevent her from consenting to a search of the Braskett residence.

The defendants cite numerous cases concerning the threshold for a finding of incapacity to consent. The cases set the bar quite high for a finding of incapacity. In *United States v. George*, 987 F.2d 1428 (9th Cir.1993), the defendant had overdosed on heroin, and was questioned by police several hours later, while he was still in critical condition. The court held the defendant's consent for officers to search his hotel room was voluntary, finding his condition "did not render him unconscious or comatose," and his consent was not coerced by the police. *George*, 987 F.2d at 1430. Similarly, in *United States v. Martin*, 781 F.2d 671 (9th Cir.1985), the defendant was questioned by police in the hospital, while he was under the influence of pain medication. The court held the defendant's consent to search was voluntary:

> Martin was awake and relatively coherent during the questioning at the hospital. . . . There is no evidence of extended and oppressive questioning. Nor had Martin received excessive quantities or unusual combinations of drugs. Martin's injuries, while painful, did not render him unconscious or comatose. Moreover, Martin said that he wanted to talk to the officers and was not reluctant to tell his story.

*Martin*, 781 F.2d at 674.

In *United States v. Freyre–Lazaro*, 3 F.3d 1496 (11th Cir.1993), involving a factual situation similar to the one in the case at hand, the defendant alleged his wife was unable to consent to a search of the defendant's home because she was emotionally distraught after having seen her son being arrested earlier that day. The court affirmed the district court's finding that the wife was capable of consenting, noting she had a "rational demeanor," and although she had witnessed her son's arrest, "both detectives testified that she was not too distraught to comprehend the implications of the search." *Freyre–Lazaro*, 3 F.3d at 1501. *See also United States v. Mancias*, 350 F.3d 800, 805–06 (8th Cir.2003) (defendant's extreme fatigue did not render his consent involuntary); *United States v. Duran*, 957 F.2d 499, 503 (7th Cir.1992) ("[T]he fact that a consenting party is extremely upset at the time she consents is not dispositive. . . . [A]bsent a showing that her emotional distress was so profound as to impair her capacity for self-determination or understanding of what the police were seeking, it is not enough to tip the balance towards finding that her consent was involuntary.").

Examining all of the factors in the instant case, the record does not reflect circumstances or factors which caused Mrs. Braskett to be incapable of consenting. In April 2010, Mrs. Braskett was an elementary school teacher, and was capable of attending work, driving her car, and caring for her children.[59] She expressed concerns about her husband's alleged use of alcohol and other drugs, and other stressors in their lives. When asked whether there were any guns in the house, Mrs. Braskett not only recalled that there was a gun and its location, she led the defendants to the gun, and asked them to unload it and to place it in the gun safe. She then took the defendants to the garage and unlocked the gun safe. These are not the actions of an incoherent or markedly impaired individual. They raise no issue about her capacity to consent.

---

**59.** Ex. 2, B. Braskett Depo. 70:21–22; Ex. 3, Fender Depo. 101:11–22.

There is no evidence here of extended or oppressive questioning. Other evidence shows Mrs. Braskett was capable of rational decision-making. She told the officers she had taken Tylenol PM, a painkiller with a sleeping agent, because she did not want to mix Motrin, which she was taking for her injured shoulder, with a regular sleeping agent.[60] I find that while Mrs. Braskett had a painful shoulder injury at the time, and was under some degree of stress due to other events in her life, no reasonable juror could find, on these facts, that Mrs. Braskett did not voluntarily consent to the "searches," given the standards for that analysis in the Ninth Circuit. Regardless of who has the burden of persuasion on the issue of Mrs. Braskett's capacity to consent, Mr. Braskett has not shown the existence of a material issue of fact in that regard.

### Ruse

Mr. Braskett further alleges that Fender and Tobey obtained entry into the Braskett residence through a lie. Mr. Braskett claims Fender and Tobey went to the Braskett residence and told Mrs. Braskett they were there to talk about her safety when, in fact, they were there to conduct a criminal investigation into Mr. Braskett's use of drugs. As such, Mr. Braskett claims that before Mrs. Braskett invited Fender and Tobey into the house, they lied about the purpose of their visit. Mr. Braskett argues this was impermissible. During oral argument, Mr. Braskett's counsel cited the recent case of *Cohen v. Boyle*, slip op., 2012 WL 1292431 (W.D.Wash. Apr. 16, 2012), for the proposition that although officers may use a ruse to gain entry to a residence in some circumstances, it is impermissible for officers to gain entry into a residence by " 'misrepresenting the scope, nature or purpose of a

government investigation.' " *Cohen,* 2012 WL 1292431 at *9 (quoting *United States v. Bosse,* 898 F.2d 113, 115 (9th Cir. 1990)).[61]

*Cohen,* itself, is not on point here, and Bosse and other Ninth Circuit precedents cited by the Cohen court would actually support the defendants' position—if, in fact, they had employed a ruse to gain entry into the residence. However, I find no ruse was employed. The record indicates that at the time Mrs. Braskett invited Fender and Tobey into the residence on April 13, 2010, she was aware that one of the subjects about which the officers wanted to talk to her was the safety of her and her children. The only "search" on that date involved Mr. Braskett's gun. On April 14, 2010, Mrs. Braskett was aware the officers were there regarding prescription pill bottles. She went looking for them. Those were the only items involved in the "searches" on the 14th. Mrs. Braskett concedes she knew, in April 2010, that the officers were at the house regarding Mr. Braskett's use of prescription medications. She knew that on either the 13th, or the 14th, or both. Because she knew it at least by the 14th, there was no ruse. I find Mrs. Braskett voluntarily consented to the officers' entry into the residence on both dates. She was not impermissibly misled by their statements regarding why they were there. The searches were not unconstitutional on this basis.

### 42 U.S.C. § 1983 Violations

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the

---

**60.** Keaney Decl., Ex. 1, B. Braskett Dep, ECF p. 40.

**61.** *See* Oral Argument Tr., July 9, 2012, at 50:13–51:4.

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ A plaintiff raising a 42 U.S.C. § 1983 claim must show that a person acting under color of state law deprived him of a constitutional right. *Dowe v. Total Action Against Poverty,* 145 F.3d 653, 658 (4th Cir.1998). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 811–812, 127 L.Ed.2d 114 (1994) (internal citations and quotation marks omitted).

### Fourth Amendment Violations

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV.

■ The Fourth Amendment is violated when a search is conducted without a warrant issued upon probable cause. A warrantless search is "per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

■ "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v.*

*Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990) (internal citations omitted).

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974) (internal citations omitted).

In a § 1983 claim such as this, to avoid summary judgment, a plaintiff must raise a material issue of fact regarding whether the person giving consent had common authority over the area searched. The *Matlock* Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Matlock,* 415 U.S. at 170, 94 S.Ct. at 993.

The Ninth Circuit has summarized post-*Matlock* cases as requiring that "a consent-giver with limited access to the searched property lacks actual authority to consent to a search.... The cases upholding searches generally rely on the consent-giver's unlimited access to property to sustain the search." *U.S. v. Kim,* 105 F.3d 1579, 1582 (9th Cir.1997).

The Ninth Circuit has upheld a spouse's authority to consent to police entering a property in which both she and the defen-

dant lived as co-tenants, finding the consent-giver was a joint-user of the property, with full access to the property, and as such, could consent to the police searching the property. *United States v. Guzman,* 852 F.2d 1117, 1121 (9th Cir.1988). In *United States v. Sealey,* 830 F.2d 1028 (9th Cir.1987), the defendant's spouse consented to police searching the property. The Ninth Circuit found the defendant's wife had mutual access to the entire property, she was part owner of the residence, she was married to the defendant, and she had full access to all parts of the residence. The defendant asserted that he retained sole ownership over sealed containers, to the exclusion of his wife. However, the Ninth Circuit rejected this assertion because, on the facts, the defendant had failed to mark the containers in such a way as to indicate his sole ownership.

### Analysis

In this case, Braskett claims the defendants entered his home, conducted a search with neither a warrant nor exigent circumstances, and removed property from the Braskett residence, all without his consent. Braskett alleges these actions violated his right to be free from "unreasonable search and seizure under the Fourth Amendment." [62] Specifically, Braskett contends that in the course of the search, the defendants violated his Fourth Amendment rights by searching his medicine cabinet, taking medical records, going through the garbage, and retrieving a handgun from the dresser. Braskett contends that at the time, Mrs. Braskett was incapable of consenting.

On or around April 12, 2010, Mrs. Braskett asked Mr. Braskett to move out of the family home. Mrs. Braskett remained in the house with their two children.[63] On Tuesday, April 13, 2010, Fender and Tobey went to the Braskett residence, identified themselves to Mrs. Braskett as members of the PPB, and talked with Mrs. Braskett at the kitchen table.[64]

Mr. and Mrs. Braskett are both on the title to the property. They both had unfettered access to the entire house. Neither of them, on this record, had ever physically or verbally excluded the other from an area within the house.[65] In fact, on the dates in question, there is no material issue of fact that Mrs. Braskett had "common authority" over all areas of the residence, and thus was able to validly consent to the defendants' search of the residence.

### I. Removal of gun from master bedroom dresser

■ While sitting at the kitchen table on April 13, 2010, Mrs. Braskett expressed her concern about Mr. Braskett's firearms around the house, and the danger they posed should their children gain access to them.[66] Mrs. Braskett led Fender and Tobey to the master bedroom, informed them that Mr. Braskett had a gun in the dresser, and asked them to remove the gun. Tobey entered the bedroom and removed the gun.[67] Fender did not enter the dresser to remove the gun, and did not

---

**62.** First Amend. Comp. ¶¶ 7 & 8.

**63.** Ex. 1, R. Braskett Depo. 31:19–23; Ex. 2, B. Braskett Depo. 69:20–70:24.

**64.** Ex. 3, Fender Depo. 58:5–7; Ex. 2, B. Braskett Depo. 77:18–79:6.

**65.** Ex. 1, R. Braskett Depo. 70:1–8; 81:2–5; Ex. 2, B. Braskett Depo. 110:13–16; 111:5–8.

**66.** Ex. 3, Fender Depo. 72:13–16; 75:20–22.

**67.** Ex. 2, B. Braskett Depo. 97:7–13; Ex. 4, Tobey Depo. 23:20–24:5.

touch the gun at any stage.[68] Tobey assumed that Mrs. Braskett had access to the dresser.[69] Mrs. Braskett allowed Tobey to unload the ammunition from the gun.[70] Mrs. Braskett opened the gun safe in the garage. The gun safe had a touchpad lock to which Mrs. Braskett knew the combination.[71] Tobey placed the gun in the safe in the garage because Mrs. Braskett did not want the gun in the house.[72] Neither Fender nor Tobey removed the firearm from the Braskett residence at any time.

The defendants allege that Fender is entitled to summary judgment because she, unlike Tobey, did not touch the gun at any point.[73] One of the reasons Fender and Tobey went to the Braskett residence was to ensure that Mrs. Braskett and her children were safe.[74] The removal of the gun from the master bedroom dresser, and its subsequent placement in the gun safe, was in line with the purpose of ensuring the safety of Mrs. Braskett and her children. Both officers were at the residence inquiring about Mrs. Braskett's safety. It would be an artificial distinction, and contrary to Fender's announced purpose for being there, to find that Fender was not involved in the removal of the gun from the master bedroom dresser. She was present in the Braskett residence when Tobey moved the gun to ensure the safety of Mrs. Braskett and her children. Both

officers were involved in the safety conversation.

However, there are no issues of material fact with respect to the gun. Mrs. Braskett had common authority over the entire Braskett residence. She knew the gun was in the dresser, and knew the combination code for the gun safe. This is consistent with her having "common authority" over at least those areas associated with the guns in the house. Tobey only entered the dresser at the request of and with the consent of Mrs. Braskett. The defendants are entitled to summary judgment with respect to the gun because the "search," which defendant does not contest for purposes of this motion, was done with appropriate consent.

## II. Search of the medicine cabinet

 · On April 14, 2010, Fender and Tobey returned to the Braskett residence to determine whether Mr. Braskett had his own prescription for painkiller medication.[75] Mrs. Braskett arrived home from work, and invited Fender and Tobey inside the Braskett residence.[76] Mrs. Braskett went upstairs to retrieve one of Mr. Braskett's medication bottles, but she was unable to find one initially because Mr. Braskett had been in the house and gotten rid of them.[77] Mrs. Braskett obtained prescription bottles from her husband's medi-

---

68. Fender Decl. ¶ 3; Ex. 3, Fender Depo. 72:12–21; 73:13–20; 79:7–12.

69. Ex. 4, Tobey Depo. 27:8–28:6.

70. Ex. 2, B. Braskett Depo. 97:11–16; 156:10–12; Ex. 3, Fender Depo. 73:1–4.

71. Ex. 2, B. Braskett Depo. 97:11–24.

72. Ex. 2, B. Braskett Depo. 97:25–98:2; Ex. 4 Tobey Decl. 24:13–14.

73. Memo in Supp. of Defs.' Motion Summ. J., 14.

74. Ex. 2, B. Braskett Depo. 77:13–17; Ex. 4, Tobey Depo. 12:20–25.

75. Tobey Depo. 34:18–22; Ex. 3, Fender Depo. 101:5–12.

76. Ex. 3, Fender Depo. 101:5–22; Ex. 4, Tobey Depo. 34:22–24; Ex. 2, B. Braskett Depo. 100:4–5.

77. Ex. 3, Fender Depo. 102:8–19; Ex. 4, Tobey Depo. 35:3–10.

cine cabinet in the master bathroom and showed them to Fender, who wrote information from the labels on a piece of paper, but did not remove the bottles from the Braskett residence.[78] Neither Fender nor Tobey ever went into either the medicine cabinet or the master bathroom on April 14, 2010.[79]

The record illustrates that there was no part of the Braskett residence from which either spouse was excluded. *Matlock* made the point that common authority is not derived from a proprietary interest, but rather is based upon the mutual use of the property such that "it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

Braskett claims that when he left his medication in the bathroom, he had a reasonable expectation of privacy, as he did not expect the PPB to come to his home.[80] The Ninth Circuit considered the scope of the mutual use doctrine in *United States v. Welch*, 4 F.3d 761 (9th Cir.1993). There, McGee and Welch rented a car and drove to Las Vegas. Both were subsequently arrested. McGee consented to a search of the car. The Ninth Circuit upheld the search of the car because both McGee and Welch had joint access to and mutual use of it, and "by sharing access to and use of the car with McGee, Welch relinquished, in part, her expectation of privacy in Fourth Amendment interests in the car." *Welch*, 4 F.3d at 764. However, the court found Welch did not relinquish her expectation of privacy in her purse which was in the car. *Id.* "The shared control of 'host' property does not serve to forfeit the expectation of privacy in containers within that property." *Id.* (internal citations and quotation marks omitted).

When applied to the instant case, Mr. Braskett apparently contends that, irrespective of Mrs. Braskett's authority over the master bathroom and medicine cabinet (i.e., the "host property"), Mr. Braskett had not necessarily forfeited an expectation of privacy in the medical records contained therein.[81] Mr. Braskett considers each of the prescription bottles to constitute a confidential medical record.[82] Here, Mr. Braskett fails to substantiate his claim that he had retained a reasonable expectation of privacy in the medical information contained on his prescription bottles. Rather, than storing his prescription bottles exclusively in his medicine cabinet, Mr. Braskett concedes that, on occasion, he left his prescription bottles around the house.[83] When Mr. Braskett disposed of his prescription bottles, he did nothing to destroy the "confidential medical records" contained on those bottles.[84] Further, Mr. Braskett has never made any effort to exclude Mrs. Braskett from his medicine cabinet.[85]

In the instant case, when Mr. Braskett left the prescription bottles in the master bathroom and medicine cabinet which Mrs. Braskett also had use of, he assumed the

---

**78.** Ex. 2, B. Braskett Depo. 101:8–102–2; 103: 16–104:4.

**79.** Ex. 2, B. Braskett Depo. 101:8–25; Ex. 3, Fender Depo. 133:15–21; Tobey Decl. ¶ 6; Fender Decl. ¶ 4.

**80.** Oral Arg. Tr., July 9, 2012, at 56:21–57:9.

**81.** Ex. 1, R. Braskett Depo. 72:16–20.

**82.** Ex. 1, R. Braskett Depo. 72:21–73:1.

**83.** Ex. 1, R. Braskett Depo. 73:6–11.

**84.** Ex. 1, R. Braskett Depo. 73:12–24.

**85.** Ex. 1, R. Braskett Depo. 70:9–12.

risk that Mrs. Braskett might permit that area to be searched. Similarly, there is nothing in the record to support any effort to exclude Mrs. Braskett from the information on the outside of the prescription bottles.

On these facts, Fender and Tobey are entitled to summary judgment on this issue as a matter of law. Their receipt of the information on the outside of the prescription bottles from the medicine cabinet was obtained by valid consent.

### III. Search of the garbage can and removal of prescription bottles from the garbage can

■ The defendants assert that Fender is entitled to summary judgment because she did not search the garbage can, or remove anything from the garbage can, whereas Tobey is entitled to summary judgment because he conducted a search with the consent of Mrs. Braskett.[86] The defendants made a similar assertion concerning the removal of the gun from the master bedroom dresser. Both officers returned to the Braskett residence on April 14, 2010, for the purpose of obtaining evidence that Mr. Braskett had prescriptions for his medications in his own name. These arguments rise and fall together. It would be an artificial distinction to say that Fender was not involved in the search of the garbage can. The search of the garbage can was in connection with the officers' joint purpose for being there.

Braskett alleges the defendants violated his Fourth Amendment rights by searching through his garbage can on April 14, 2010. The record reflects neither who placed the garbage can at the curb, nor when the garbage can was placed at the curb. However, it appears it was Mr. Braskett, himself, who removed the prescription bottles from the computer room and placed them, along with the contents of the computer room wastebasket, in the garbage can on April 14, 2010. It is unclear from the record exactly when Mr. Braskett put the prescription bottles in the garbage can. There are two possibilities. First, Mr. Braskett placed the prescription bottles in the garbage can in the garage, before the garbage can was taken out to the curb. Second, Mr. Braskett went to the curb and placed the prescription bottles in the garbage can which had already been taken out to the curb. If it was the former, when the garbage can was in the garage, it was in an area over which Mrs. Braskett had common authority, and, as such, she could consent to a search of the garbage can in that area. If it was the latter, Mr. Braskett had no expectation of privacy in the contents of the garbage can at the curb for pickup. As Mr. Braskett concedes, once garbage goes to the curb, the owner has relinquished any privacy interest in its contents.[87]

It is not disputed that Mrs. Braskett opened the garbage can where Mr. Braskett's prescription bottles were found. There is a dispute as to who retrieved the bag from the garbage can; however, that dispute is not material. Even viewing the facts in the light most favorable to the non-moving party, there would be no violation of Mr. Braskett's Fourth Amendment rights arising from the officers' removal of the prescription medication bottles from the garbage can, as it was done with the consent of Mrs. Braskett.

Mr. Braskett has failed to establish the existence of a genuine issue of material fact for trial. Therefore, the defendants'

**86.** Memo in Supp. of Defs.' Motion Summ. J., 16.

**87.** Ex. 1, R. Braskett Depo. 152:17–20.

motion for summary judgment on this claim is granted.

### IV. Removal of confidential medical information from prescription bottles

Braskett alleges the defendants violated his Fourth Amendment rights by taking medical records. Braskett considers the information contained on his prescription bottles to constitute a medical record.[88] It is not clear, but the court assumes he pursues this theory with respect to the information on the prescription bottles from the medicine cabinet and from the garbage can in the garbage.

Braskett admits he did not always keep his prescription bottles secure in his medicine cabinet,[89] and he concedes that when he disposed of his prescription bottles, he did not attempt to remove any of his personal information contained on the bottles.[90] The plastic bag containing the empty prescription bottles was in the garbage can inside the garage, and perhaps at the curb, as well. Mr. Braskett is aware that anybody could have accessed the garbage can while it was on the street.[91] Before he discarded the prescription bottles, this record shows he left them in at least two locations: the computer room and the master bathroom. Wherever Mr. Braskett kept his prescription bottles was, on this record, a place where Mrs. Braskett had unfettered access to the bottles and the information on their labels. As previously discussed, she had common authority over both the locations from which prescription bottles were retrieved.

Mrs. Braskett consented to the removal of the prescription bottles from the garbage can and from the medicine cabinet, and therefore, there was no violation of the Fourth Amendment with respect to the information on the outside of the bottles. The defendants are entitled to summary judgment here, as well.

### CONCLUSION

For the reasons discussed above, The defendants' motion (Docket No. 30) for summary judgment is **GRANTED**.

IT IS SO ORDERED.

---

88. Ex. 1, R. Braskett Depo. 72:21–73:1.

89. Ex. 1, R. Braskett Depo. 73:6–11.

90. Ex. 1, R. Braskett Depo. 73:2–24, 152:9–11.

91. Ex. 1, R. Braskett Depo. 73:2–24: 104:5–105:24; 152:9–11.