# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2010AP3034-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent, |
| |    v. |
| | Kenneth M. Sobczak, |
| |         Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 338 Wis. 2d 410, 808 N.W.2d 730
(Ct. App. 2012 – Published)
PDC No: 2012 WI App 6

| | |
|---|---|
| OPINION FILED: | June 20, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 4, 2012 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Washington |
|   JUDGE: | Patrick J. Faragher |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, J., concurs. (Opinion filed.) |
|   DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
|   NOT PARTICIPATING: | PROSSER, J., did not participate. |

ATTORNEYS:

    For the defendant-appellant-petitioner, there were briefs and oral argument by *Andrew R. Hinkel*, assistant state public defender.

    For the plaintiff-respondent, the cause was argued by *Warren Weinstein*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2010AP3034-CR
(L.C. No. 2009CF297)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Kenneth M. Sobczak,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**JUN 20, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 MICHAEL J. GABLEMAN, J. Our Constitution obeys the "centuries-old principle of respect for the privacy of the home," Wilson v. Layne, 526 U.S. 603, 610 (1999), and the state therefore may not intrude into a residence without a warrant unless it satisfies one of the few and narrowly-drawn exceptions to the warrant requirement. Welsh v. Wisconsin, 466 U.S. 740, 749 (1984). One exception permits the police to enter the home when the prosecution can persuade a court that the officer was invited to cross the threshold by someone authorized by the defendant to extend such invitations. United States v. Matlock,

415 U.S. 164, 171 (1974). At issue now is whether Kristina Podella had that authority when she invited law enforcement to enter Kenneth Sobczak's residence and view suspicious files on his computer. The circuit court found that she did have that authority and accordingly denied Sobczak's motion to suppress, and the court of appeals agreed. We agree with both the trial and appellate courts, and consequently affirm the decision of the court of appeals.

## I. BACKGROUND

¶2 The relevant facts are undisputed and taken largely from the uncontroverted testimony offered at the suppression hearing. Sobczak and Podella met online and began dating in the summer of 2009.[1] In early-September 2009, approximately three months into their relationship, Sobczak was living at his parents' home in Hartford, Wisconsin and Podella was living in

---

[1] More specifically, Officer Nathanial (spelled "Nathaniel" elsewhere in the record) Dorn testified at the suppression hearing that Podella informed him that she and Sobczak met approximately three months earlier and "had been dating." In Sobczak's statement of facts in his initial brief, Podella describes Sobczak to Officer Dorn as "her boyfriend of three months." No party disputes either Officer Dorn's characterization in his testimony or Sobczak's in his filing— indeed, the State adopts Sobczak's statement of the facts as its own and presents only certain additional facts. For convenience, we will use "romantic," "dating," "girlfriend," and similar terms in our opinion in discussing the type of relationship between Podella and Sobczak. We do not thereby imply that we are drawing a firm line in Fourth Amendment law based on the degree of intimacy shared by the consenter and the defendant, though that degree is one factor to be considered amongst several, and it is one factor we consider here. See ¶20 infra.

Kenosha.   At Sobczak's invitation, Podella arrived at the Hartford residence on Friday, September 4, 2009 to spend the weekend while Sobczak's parents were away on vacation, planning to depart on Sunday, September 6.   The afternoon of the following day, Sobczak reported to his bartending job, leaving Podella alone in the house.   Because she had no means of transportation and was unfamiliar with the town, Podella asked and received permission from Sobczak to use his personal laptop to occupy herself in his absence.

¶3   While using the laptop, Podella encountered a video file that appeared to show underage girls engaging in sexual behavior.   She further observed four or five other videos with file-names that suggested to her that they might contain child pornography, but she did not open any of them.   Troubled by these discoveries, Podella called her grandmother and asked her to call the police, which the grandmother promptly did.

¶4   Officer Nathanial Dorn arrived at the scene shortly thereafter and Podella met him at the front door of the house. While standing on the porch, the two spoke for about ten minutes.   During the course of that conversation, Podella conveyed her suspicions regarding the videos.   To quote his uncontested testimony at the suppression hearing, Officer Dorn responded as follows:

> So I asked her [sic] I'm going to need to view the
> video.  I said we can either go inside and look at it,
> or you can bring it out here; whatever is more
> comfortable for you.  She said, no, we can go inside
> and look at it.  She [had been] sitting on the couch
> [with the laptop,] which she then pointed out, and I

could see through the front door [that the couch] was a few feet inside, which was 20 feet inside the front door.

¶5  Officer Dorn then asked Podella if he could enter the residence and she answered in the affirmative.  Once inside, Officer Dorn informed Podella, as he later testified, that he would "have to look at the video to view it."  Podella agreed to help him do so and found the video on the computer, which had been sitting on the couch throughout the encounter.  Having located the video, Podella pressed play and Officer Dorn watched the video.  Like Podella, Officer Dorn believed that the video contained child pornography, and he briefly inspected "a couple" of the other videos that had aroused Podella's suspicions.  He thought that these too depicted child pornography and called his supervisor for guidance.  Officer Dorn's supervisor instructed him to bring the laptop to the station, and he complied.

## II.  PROCEDURAL HISTORY

¶6  Sobczak was arrested and charged with possession of child pornography in Washington County Circuit Court.  He filed a motion to suppress the evidence seized on the ground that it was taken in violation of his Fourth Amendment rights.[2]  The circuit court, Faragher, J., denied the motion to suppress, concluding that Podella validly consented to Officer Dorn's

---

[2] The motion to suppress also made reference to the Fifth Amendment, but Sobczak does not raise a Fifth Amendment argument here.

entry and search.[3] In a unanimous, published opinion the court of appeals affirmed, reasoning that Podella "had actual authority to consent to the officer's entry into the house and to the search and seizure of Sobczak's laptop." State v. Sobczak, 2012 WI App 6, ¶12, 338 Wis. 2d 410, 808 N.W.2d 730.

¶7 Explaining its decision, the panel wrote that "[w]hile a mere guest in a home may not ordinarily consent to a search of the premises, the analysis is different when the guest is more than a casual visitor but instead has 'the run of the house.'" Id. (quoting 4 Wayne R. LaFave, Search and Seizure, § 8.5(e) (4th ed. 2011). To resolve whether Podella had the run of the house in this sense, the court of appeals reviewed Podella's relationship with the house and the laptop, emphasizing that she was invited to stay at the house for the weekend and that Sobczak never contended that he placed any restrictions on her use of the property or the laptop while alone in the residence. Id. In light of those facts, the court determined that Podella did have the run of the house for Fourth Amendment purposes and "thus had authority to allow the officers to enter the residence and to search and seize Sobczak's computer." Id. However, the court took care to highlight the outer boundaries of its holding, noting that Podella's "authority to consent to a search was limited to the property that she possessed 'common

---

[3] In its oral ruling, the circuit court appeared to rely upon a variety of other justifications for upholding the search, including exigent circumstances, property law, and public policy, among others. The State does not defend the judgment on any of these grounds and we do not consider them.

authority' over," which here encompassed the living room into which she led Officer Dorn and the laptop she presented for his inspection. Id., ¶13.

¶8 We granted Sobczak's petition for review and now affirm.

## III. STANDARD OF REVIEW

¶9 When ascertaining whether evidence should have been suppressed as the result of a Fourth Amendment violation, we are confronted with a mixed question of law and fact. State v. Buchanan, 2011 WI 49, ¶8, 334 Wis. 2d 379, 799 N.W.2d 775. First, the circuit court's findings of fact are taken as true unless clearly erroneous. State v. Sykes, 2005 WI 48, ¶12, 279 Wis. 2d 742, 695 N.W.2d 277. Second, our application of constitutional principles to those facts is de novo. State v. Vorburger, 2002 WI 105, ¶32, 255 Wis. 2d 537, 648 N.W.2d 829.

## IV. DISCUSSION

¶10 As we explain below, Podella had actual authority to consent to Officer Dorn's entry and search of the laptop. Sobczak's motion to suppress was therefore properly denied by the circuit court and that judgment in turn was properly affirmed by the court of appeals.

## A. FOURTH AMENDMENT BACKGROUND PRINCIPLES

¶11 A cornerstone of our Bill of Rights, the Fourth Amendment to the United States Constitution forbids law enforcement from conducting "unreasonable searches and

seizures."[4] The Fourth Amendment applies to state officers by virtue of its incorporation through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961); State v. Hess, 2010 WI 82, ¶41, 327 Wis. 2d 524, 785 N.W.2d 568. It has long been established that the Fourth Amendment places the greatest protection around the home, as it was drafted in part to codify "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601 (1980) (footnote omitted); Holt v. State, 17 Wis. 2d 468, 477, 117 N.W.2d 626 (1962) ("A home is entitled to special dignity and special sanctity."). Due to the constitutional sanctity of the home, the police may not venture across the threshold without a warrant except under limited circumstances, on pain of suppression. Kyllo v. United States, 533 U.S. 27, 31 (2001); State v. Pinkard, 2010 WI 81, ¶13, 327 Wis. 2d 346, 785 N.W.2d 592. One such exception——"jealously and carefully drawn"——"recognizes the validity of searches with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006) (internal quotation marks and

---

[4] A parallel provision is enshrined in the Wisconsin Constitution. Wis. Const. Art. I, § 11. Sobczak relies solely upon its federal counterpart, so our discussion too will be limited to the U.S. Constitution. In any event, though, we ordinarily interpret the two identically. See State v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598 ("On only one occasion in our development of Article I, Section 11 jurisprudence have we required a showing different from that required by the [U.S.] Supreme Court's Fourth Amendment jurisprudence.").

citation omitted); see generally State v. McGovern, 77 Wis. 2d 203, 252 N.W.2d 365 (1977). In order to preserve the integrity of the warrant requirement, when the State seeks to admit evidence searched or seized without a warrant on grounds of lawful consent, it must prove, by clear and convincing evidence, that it obtained such consent. State v. Tomlinson, 2002 WI 91, ¶21, 254 Wis. 2d 502, 648 N.W.2d 367. As a factual matter, the parties agree that Podella consented to Officer Dorn's entry and search. They disagree as to whether the Fourth Amendment empowered her to offer such consent. As we show below, it did.

### B. WEEKEND GUESTS ARE NOT PER SE EXCLUDED FROM GRANTING THIRD-PARTY CONSENT TO ENTER A HOME AND CONDUCT A SEARCH THEREIN

¶12 The U.S. Supreme Court has recently reiterated that the Fourth "Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on . . . houses . . . , a search within the original meaning of the Fourth Amendment has undoubtedly occurred." Florida v. Jardines, 569 U.S. __, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks and citation omitted). It is undisputed here that the State acquired the incriminating evidence from the laptop "by physically intruding" into the home. If the officers so intruded in violation of the Fourth Amendment, then, the challenged evidence must be suppressed. See id. at 1417 ("That the officers learned what they learned

only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred," and since the search was not justified under the Fourth Amendment the evidence seized was properly excluded). Thus the question for us is whether Officer Dorn had the constitutional authority to enter the home and search the laptop.[5] He did.

¶13 Sobczak's principal argument is that Podella could not have had actual authority to consent to Officer Dorn's entry to the house and living room because she was merely a weekend guest. In his view, the exception set forth by Matlock is limited to "co-occupants" and "co-inhabitants," and does not cover those with shorter stays like Podella. Effectively, Sobczak asks us to draw a bright-line rule focused solely on the duration of the consenter's time in the residence. For several reasons, we decline to do so.

¶14 First, while it is true, as Sobczak points out, that the U.S. Supreme Court has used the terms "co-occupant" and "co-inhabitant" in articulating the third-party consent doctrine, see, e.g., Randolph, 547 U.S. at 109, 111, it has been careful not to require a slavish devotion to such titles. Instead, the court has cautioned that the analysis hinges not "upon the law of property, with its attendant historical and legal refinement . . . but rests rather on mutual use of the property

---

[5] According to his testimony, Officer Dorn discussed with Podella the possibility of her bringing the laptop outside the home for him to inspect it. She never did so, however, so we need not analyze the constitutionality of that hypothetical scenario.

by persons generally having joint access or control for most purposes . . . ." Matlock, 415 U.S. at 171 n.7; cf. Missouri v. McNeely, 569 U.S. __, 133 S. Ct. 1552, 1564 (2013) ("While the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake."). Although Sobczak pays lip-service to this crucial footnote from Matlock, claiming that it supports his "commonsensical understanding" as to who possesses authority, his proposed approach flatly contradicts it. For what would a single-minded fixation on the often-blurry distinction between co-occupants, weekend guests, and so on be if not the type of overly formalistic property-law inquiry that the U.S. Supreme Court has expressly disavowed in this area?[6]

---

[6] In a recent decision on a Fourth Amendment question relating to law enforcement's use of global positioning systems, the U.S. Supreme Court explained that property law remains relevant to search-and-seizure jurisprudence in certain circumstances. See United States v. Jones, 565 U.S. __, 132 S. Ct. 945, 950 (2012) (clarifying that while some of the court's cases "deviated from [an] exclusively property-based approach," it never renounced the notion that the Fourth Amendment embodies "a particular concern for government trespass upon the areas" protected by the Amendment). The Jones court, however, did not suggest that third-party consent cases must now be viewed through the lens of formal property law, after United States v. Matlock, 415 U.S. 164 (1974) said the opposite, and other courts have not read Jones as working such a dramatic change in the law. See Braskett v. Fender, 884 F. Supp. 2d 1119, 1130 (D. Or. 2012) (quoting Matlock's repudiation of property law in the third-party consent context and not mentioning Jones); People v. Fernandez, 145 Cal. Rptr. 3d 51, 59 (Ct. App. 2012) (same), cert. granted, 569 U.S. __, __ S. Ct. __, 2013 WL 2149804 (2013); Pryor v. City of Clearlake, 877 F. Supp. 2d 929, 944

¶15 Resisting this inevitable conclusion, Sobczak insists that the strict weekend guest/co-occupant dichotomy he constructs to delineate who has authority to consent can be maintained within the more flexible framework established by the U.S. Supreme Court. As Sobczak acknowledges, the power to give consent turns on "widely shared social expectations" and "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." Randolph, 547 U.S. at 111. In other words, the exception is premised on the axiom that people who "share quarters . . . understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." Id. Sobczak recognizes this language and seeks to turn it to his advantage, submitting that no such assumption of risk takes place when a guest is invited to spend the weekend. We are aware of authority from other jurisdictions to that effect, see, e.g., People v. Pickens, 655 N.E.2d 1206, 1209 (Ill. Ct. App. 1995), but viewed in relation to the reasoning of the U.S. Supreme Court's binding case law we think it conceptually unsound.

¶16 Human nature being what it is, most members of society do not ground their expectations regarding the potential

_____

(N.D. Cal. 2012) (same). We follow Matlock's dictate on third-party consent and its separation from property law, as neither the U.S. Supreme Court nor our own has departed from its analytical approach.

behavior of guests on formal titles like "co-occupant" and "weekend guest," divorced from all context. Cf. State v. Kieffer, 217 Wis. 2d 531, 544, 577 N.W.2d 352 (1998) (stressing that the familial relationship of the consenter to the defendant is one non-dispositive factor among others). Nor should they, as not all "weekend guests" are created equal. As counsel for the State astutely noted at oral argument, a college student home for the weekend enjoys a very different status than a casual acquaintance left momentarily at a home while the owner runs an errand. It would be absurd to sanction a police officer for entering a home after being let in by a college student who had spent, say, 18 of his 20 years living at the residence solely because he was, at that particular time, merely a "weekend guest." Society is not so irrational.[7]

¶17 The only binding authority that is arguably at odds with our conclusion is Illinois v. Rodriguez, 497 U.S. 177

---

[7] Instructively, the approach we take today was followed by a court that reached the opposite outcome, but did so not with reference to the inflexible rule advocated by Sobczak, but rather in consideration of the quality of the relationship between the consenter and the premises. In that decision, Cardenas v. State, the Texas Court of Appeals declared, "At best, [the consenter] was merely a" passing acquaintance who happened to spend the night. "Consequently," the court reasoned, "he did not have actual authority to consent to the officer's entry." 115 S.W.3d 54, 60 (2003) (citation omitted). The distinction between a passing acquaintance who happens to spend the night like the consenter in Cardenas and an overnight guest in a romantic relationship with the defendant is precisely the type of distinction that alters the "widely shared social expectations" regarding access and risk that guide our inquiry. Georgia v. Randolph, 547 U.S. 103, 111 (2006).

(1990). There, the U.S. Supreme Court reviewed a case in which a woman named Gail Fischer had lived with the defendant for several months but left almost a month before the challenged search, taking her children's clothing with her but leaving behind various pieces of furniture and other objects. Id. at 181. After moving out, Fischer occasionally stayed overnight at the defendant's apartment, to which she had a key, though she did not invite friends, did not go when he was not there, did not have her name on the lease, and did not contribute to the rent. Id. In a cursory two sentences,[8] the court dismissed the possibility that Fischer had actual authority to consent to a search of the apartment, calling the lower court's rejection of that assertion "obviously correct." Id. at 181-82.

¶18 Sobczak reasonably regards this passage as most helpful to his cause, seeing as how Fischer was in some senses more closely associated with the searched premises than was Podella, as she had lived there in the past, had left belongings there, and had a key.[9] Id. It is an argument with some

---

[8] The full passage reads, in its entirety: "On these facts the State has not established that, with respect to the South California apartment, Fischer had 'joint access or control for most purposes.' To the contrary, the Appellate Court's determination of no common authority over the apartment was obviously correct." Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990).

[9] Though it was unclear whether she obtained the key with the defendant's permission. Rodriguez, 497 U.S. at 181. Officer Dorn testified that he had no recollection whether he asked Podella if she had a key to the residence, and we consequently cannot base our decision on a finding that she did.

13

persuasive force. In the final analysis, however, we must follow the underlying logic of the Supreme Court in its definitive pronouncement on the subject, not a passing remark in an opinion almost entirely devoted to other issues.[10] Matlock is the law on actual authority in third-party consent cases, and Matlock directs us to consider the "widely shared social expectations" and "commonly held understanding" that give rise to an assumption of risk that an individual in one's domicile may admit others. As we have explained, such considerations are

---

[10] The dissent's characterization of our comments on Rodriguez borders on the disingenuous. It accuses us of "reject[ing] the Supreme Court's holding as 'cursory'" when it was instead "measured and deliberate . . . ." Dissent, ¶74 (emphasis added). Though the dissent prefers to pretend otherwise, Rodriguez contains three holdings: 1) the consenter had no actual authority; 2) the state court relied upon federal and not state law; and 3) a remand was necessary for a determination of whether there was apparent authority. See generally Rodriguez, 497 U.S. 177. The section deemed "measured and deliberate" by the dissent takes up one paragraph, contains a single citation (to Matlock), and includes no substantive analysis. Id. at 181-82. In stark contrast, Justice Scalia devoted 10 paragraphs, 6 pages, and citations to 13 different cases to resolve the third issue. One need not be a constitutional scholar to readily detect the court's principal motive for taking up and deciding the case: it was to establish, for the first time, the new doctrine of apparent authority (which required the court to find no actual authority), not to recite a bare-bones summary of a doctrine that was already 16-years old at the time and then apply it without any substantive analysis. That is not to say that we can ignore Rodriguez's words concerning actual authority, and we do not do so. Unlike the dissent, however, we opt not to bury our heads in the sand regarding the context of Rodriguez and Matlock in attempting to resolve the tension between the two.

14

incompatible with a blanket refusal to grant <u>some</u> weekend guests the authority to consent.[11]

¶19 In sum, as with most search-and-seizure cases, the question of whether law enforcement acted reasonably within the meaning of the Constitution here depends not upon the application of a rigid rule like the one Sobczak proposes, but upon "the peculiar facts and circumstances" of the case. <u>State v. Pires</u>, 55 Wis. 2d 597, 609, 201 N.W.2d 153 (1972) (footnote omitted); <u>see also</u> <u>McNeely</u>, 133 S. Ct. at 1564 ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules . . . ."). With respect to third-party consent, there are certain types of "peculiar facts and circumstance" that deserve special attention. The <u>Matlock</u> court explained that what grants authority to a third party to consent is "common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171 (footnote omitted). It follows that the courts must explore any facts that bear on that authority and that

---

[11] The dissent describes our opinion as "refus[ing] to recognize" <u>Rodriguez</u> as binding. Dissent, ¶74. Untrue. We acknowledge, as we must, that <u>Rodriguez</u> is binding, but so too is <u>Matlock</u>, and the result of the former is incompatible with the test set forth by the latter. It is not a novel situation for tension to exist between two binding precedents. When it does, we discharge our constitutional duty as a law-developing court better by honestly grappling with the tension, as we have done here, rather than ignoring it, as the dissent elects to do.

15

relationship to assess whether the third party had actual authority to consent. See Kieffer, 217 Wis. 2d at 542 ("[I]t is the sufficiency of the consenting individual's relationship to the premises to be searched . . . that the State must establish."). In McGovern we did just that, affirming the suppression of evidence seized on grounds of third-party consent because there was nothing in the record to reflect mutual use of the property, joint access or control, "or that the room's occupants assumed the risk one of their number might permit the common area to be searched." 77 Wis. 2d at 215.

¶20 To date, we have had little opportunity to elaborate on the specific factors that weigh on whether an individual has the constitutional authority to invite law enforcement into the home of another. This case requires us to expand the list. First, the relationship of the consenter to the defendant is important, not only in the familial sense, Kieffer, 217 Wis. 2d at 544, but also in terms of the social ties between the

two. A romantic[12] relationship, for example, gives rise to different expectations than does a passing acquaintance or a purely economic connection. See, e.g., Chapman v. United States, 365 U.S. 610, 616-17 (1961) (holding that a landlord could not consent to a search of a tenant's home). Second, the duration of the consenter's stay in the premises can shed light

---

[12] We are perplexed by the dissent's concern over our occasional use of the words "romantic" and "intimate." See dissent, ¶¶62-64. While the dissent is troubled that the terms "girlfriend" and "dating" are undefined, it provides no definition for the apparently crucial word "romantic." As we have noted, we use "romantic" merely to indicate that Sobczak and Podella enjoyed a more intimate association than, say, strangers or passing acquaintances. See supra ¶2 n.1. The dissent appears to assume that the term "romantic" applies only to star-crossed lovers of the Romeo and Juliet variety. While we admire the dissent's idealism, we use the word in the more pedestrian sense to convey an intimate, personal relationship. Prior to today's protestations from the dissent, we would not have thought such a use controversial. See, e.g., Lasure v. Commonwealth, 390 S.W.3d 139, 140 (Ky. 2012)("Thereafter, Lasure's relationship with Tolliver became romantic and the two began casually dating."); Tex. Fam. Code Ann. § 71.0021(b) (West 2013) (defining "dating relationship" as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature"). We might just as accurately have used the term "dating relationship" instead of "romantic relationship," but because there is no need to do so, we are comfortable with our chosen nomenclature. At any rate, we agree with the dissent's more general observation that "[t]he more distant the relationship [between the consenter and the resident], the more likely" there is no actual authority. Dissent, ¶61. When all is said and done, the dissent's quibble regarding our terminology serves more as a smokescreen for its dubious application of this general principle than as the articulation of a meaningful dispute. For the only real upshot of the dissent's lengthy exegesis on the nature of romance is that it considers a girlfriend of three months to be a distant association under the Fourth Amendment. Neither society nor the Constitution shares that groundless assumption.

on her authority to allow visitors in, though, as we have demonstrated, that alone does not settle the question.[13]  See, e.g., Commonwealth v. Lopez, 937 N.E.2d 949, 957 n.9 (Mass. 2010) (including the duration of the guest's stay as a factor in the determination of actual authority to consent).  Third, a defendant's decision to leave an individual in his home alone helps support an inference that the individual has been given some choice in excluding some visitors and opening the door to others.  See, e.g., United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010) (noting that the consenter was regularly left

---

[13] In rather overheated prose, the dissent remarks that "federal and state courts alike have held the line, refusing to recognize that temporary guests, without more, have actual authority to consent."   Dissent, ¶79.   Drama aside, the insertion of the caveat "without more" strips this sentence of any discernible content.   Certainly the Fourth Amendment does not permit the police to rifle through a person's drawers at the behest of a complete stranger invited into a foyer for five minutes.   If that is what the dissent means to say, its statement is quite right, and quite beside the point, as Podella does not remotely fit that description.   If instead the dissent means to imply that a non-resident can never offer consent, that is simply not the law.   The leading treatise on Fourth Amendment jurisprudence notes the "sound authority" that allows a guest who has "the run of the house" to consent "to a police entry into an area where a visitor would normally be received."   4 Wayne R. LaFave, Search and Seizure, § 8.5(e) (5th ed. 2012). LaFave is routinely cited in search and seizure cases, including in numerous decisions by this court and the U.S. Supreme Court. See, e.g., State v. Sveum, 2010 WI 92, ¶33, 328 Wis. 2d 369, 787 N.W.2d 317; Arizona v. Gant, 556 U.S. 332, 345 n.5 (2009).   More to the point, the rule enunciated in § 8.5(e) is cited to seven opinions and has, in turn, been cited in jurisdictions around the country.   See, e.g., State v. Morse, 123 P.3d 832, 837-38 (Wash. 2005); Hilbish v. State, 891 P.2d 841, 848 (Alaska Ct. App. 1995).   The dissent's assertions notwithstanding, we break no new legal ground here.

alone in the home as one of the reasons supporting a finding of actual authority). Of course, the longer a person is left alone in the home, the more likely she will have authority to consent. See, e.g., Davis v. State, 422 S.E.2d 546, 549 (Ga. 1992) (mentioning the limited time period for which the consenter was left alone in the home in finding a lack of authority to consent). Finally, there are the various other miscellaneous facts that may illuminate the depth of an individual's relationship to the premises, such as whether she has been given a key, whether she keeps belongings in the home, whether her driver's license lists the residence as her address, and so on. See State v. St. Martin, 2011 WI 44, ¶18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858, cert. denied, 565 U.S. __, 132 S. Ct. 1003 (2012).[14]

¶21 We now apply these factors to the facts at hand.

### C. PODELLA HAD ACTUAL AUTHORITY TO CONSENT TO OFFICER DORN'S ENTRY INTO THE HOME AND THE LIVING ROOM

¶22 An application of the factors enumerated above to the facts of the instant case can lead to but one conclusion: Podella had actual authority to invite Officer Dorn into Sobczak's parents' home. Notably, Podella was Sobczak's girlfriend of three months. It is safe to presume that such an

---

[14] We hasten to add that the list above is not exclusive but rather composed with an eye to the facts of the case at bar. Other searches will no doubt implicate other factors that may assist in the inquiry. For a more extensive list of potential factors, see, e.g., United States v. Groves, 530 F.3d 506, 509-10 (7th Cir. 2008).

intimate relationship imbues a person with more authority than she would otherwise have vis-à-vis her partner and his home. See, e.g., United States v. Collins, 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007) (remarking that "a close personal . . . relationship" between the consenter and the defendant bolsters a showing of authority to consent) (footnote omitted). Equally significantly, Sobczak encouraged Podella to spend an evening alone in the home, and placed no apparent restrictions on her use of the house. To extend such trust to Podella, Sobczak must have envisioned her "mutual use of the property" and her possession of "joint access or control for most purposes," Matlock, 415 U.S. at 171 n.7, thus favoring a conclusion that he assumed the risk she would let in unwanted visitors.[15]

¶23 We respectfully disagree with the dissent's claim that Podella did not have joint access or control because "[a]ny access and control . . . was limited to the temporary access and control a weekend guest might have when invited to someone else's home to stay for a short time." Dissent, ¶69. The

---

[15] The dissent maintains that "nothing in the record supports" our view that Sobczak assumed the risk that Podella would invite unwanted guests onto the premises. Dissent, ¶58. However, the fact that the record contains no indication of any restrictions placed upon Podella's use of the house is itself evidence that she was granted unlimited use of it, which in turn reinforces the conclusion that Sobczak assumed the risk of her welcoming the police into the home. Cf. United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010) (finding actual authority in part because "nothing in the record suggests any restrictions or limitations whatsoever on [the consenter's] access to or use of any part of the home.").

dissent does not clarify what these limitations must be, and we find it difficult to imagine they are so substantial as to eclipse the control she <u>did</u> exercise. Granted, a weekend guest left in a home alone cannot legally sell the property, but it seems she can do a great deal else with it. The fact that Sobczak permitted Podella to stay in the house alone where there are no indicia that he placed any restrictions on her use of the property is a powerful sign that she had the authority to bring Officer Dorn into an area of the home to which visitors would be expected to come.[16]

¶24 Lastly, although Podella's weekend invitation does not put her in the company of long-term guests with more expansive authority over the premises, it does distinguish her from the far briefer stays that have occasioned judicial rejection of claims of authority. <u>See, e.g.</u>, <u>United States v. Cos</u>, 498 F.3d 1115, 1128 (10th Cir. 2007) (excluding evidence where the

---

[16] That does not necessarily mean that Podella would have been entitled to invite Officer Dorn into every area of the house. If Officer Dorn had conducted the search in a different room, other facts, such as whether the room was locked, would presumably have been brought out at the suppression hearing and those facts would then bear on the Fourth Amendment analysis. <u>Cf.</u> <u>State v. Vinuya</u>, 32 P.3d 116, 128-32 (Haw. Ct. App. 2001) (finding actual authority to consent to a search of the common areas of the house but no actual authority to consent to a search of the defendant's locked bedroom). That is not the case before us. We consider Podella's seemingly unrestricted use of the home only as it relates to her invitation to Officer Dorn to enter the living room and search the laptop there. We make no comment regarding any other area of the residence.

consenter was left alone in home for 40 minutes before the arrival of law enforcement).

¶25 There are, to be sure, considerations cutting in the opposite direction. In particular, Podella's stay, while not of the extremely brief duration of the consenter's in Cos, was also not of the more indefinite length at issue in many third-party consent cases. See, e.g., Matlock, 415 U.S. at 166 (noting that the consenter lived at the house with her son). Furthermore, there is no evidence that Podella had ever stayed in the house before, that she had been given a key to the residence, that she was leaving any belongings there or intended to return in the future, or any other indication of a relationship to the building that extended beyond the weekend of September 4, 2009. These omissions are not insignificant, and they make the case a far closer one that it would otherwise be. Nevertheless, they are insufficient to outweigh the more compelling factors militating in favor of authority to consent. Ultimately, we believe society would expect a girlfriend of three months, left alone in a home and given unrestricted access to the common areas of the home, to enjoy the authority to invite guests in to

those common areas, even with potentially deleterious consequences to her boyfriend.[17]

¶26 The dissent purports to go through the same balancing test that we conduct, but it puts its thumb on the scales and preordains the result by concluding that Podella could not have had actual authority because "[a]ny access or control" she had "was clearly inferior to that of the defendant . . . ." Dissent, ¶69. If the only question for authority purposes was whether the consenter enjoys the <u>same</u> amount of access to and control over the property as the defendant, there would be no need to run through all of the various factors in the list. Instead, a court could simply search the list for the single respect in which the consenter's access or control was "inferior" and then suppress the challenged evidence. That is plainly not the law. <u>See, e.g.</u>, <u>United States v. Kimoana</u>, 383 F.3d 1215, 1222 (10th Cir. 2004) (finding that the consenter had actual authority to allow law enforcement to search a motel room because "he had stayed there overnight, left his possessions

---

[17] The dissent chides us for making it "easier for a weekend houseguest than a co-resident to be accorded authority to consent to a search of another's residence." Dissent, ¶72. We have done no such thing. As should be abundantly clear from a cursory review of our opinion, many of the factors we consider would quite obviously lend themselves to a stronger case for authority with a resident than with a weekend guest. For instance, the duration of a consenting resident's stay would presumably be indefinite or at least substantial, and such a person would almost certainly be left home alone at times, would possess a key, would have belongings at the premises, and so on. Contrary to the dissent's undefended assumption, the fact that <u>this</u> weekend guest had authority does not mean that all do.

there, and carried a key to the room" even though he "was not the registered guest who had paid for the room . . . ."); United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997) (finding that the consenter had actual authority to permit police to search a storage unit because it was leased in his name, even though the defendant "had the only key to the lock and had general control over the unit" and even though the consenter "did not have independent access and, without [the defendant's] permission, . . . did not have the authority to open the unit (and never did open it for his own purposes).").

¶27 There can be no doubt that "the Fourth Amendment has drawn a firm line at the entrance to the house," Payton, 445 U.S. at 590, and it is our duty to zealously guard that line. See Kyllo, 533 U.S. at 37 ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.") (Emphasis in original.) But the line was crossed here upon valid consent, and Officer Dorn's entry was therefore within the bounds set by the Constitution.

¶28 Consent to enter a home, however, does not necessarily confer authority to enter a particular room within the home. Cf. Florida v. Jimeno, 500 U.S. 248, 251-52 (1991) (discussing when consent to search a car implies consent to search containers within the car, and when it does not). The Fourth Amendment therefore demands a justification for Officer Dorn's entry to the living room, where the search of the laptop occurred. That justification is readily apparent. Officer Dorn testified, without dispute, that the search took place in the

24

living room, 20 feet inside the front door. Sobczak does not suggest that he had placed the living room off limits to Podella during her visit and, given that she was his girlfriend and was left alone in the home for an evening, it is implausible to imagine that he would have. As a result, Podella had "joint access or control" of the living room "for most purposes," Matlock, 415 U.S. at 171 n.7, and she was legally entitled to bring Officer Dorn into that room. Cf. Logan v. State, 729 N.E.2d 125, 130-31 (Ind. 2000) (finding proper third-party consent to search a living room where there was "nothing in the record to indicate that police should have been on notice that the room was anything other than what it appeared to be- a living room used by all the residents of the home.").

D. OFFICER DORN'S SEARCH OF THE LAPTOP WAS PERFORMED UPON VALID CONSENT

¶29 Having resolved that Officer Dorn's entry to the home and living room were constitutionally permissible, the only question that remains is whether his search of the laptop was as well.[18] For similar reasons, the search did not transgress the

---

[18] Sobczak's position regarding the relationship between the entry and the search is less than crystal clear. On the one hand, he repeatedly frames the issue in terms of the search, characterizing it in one place as whether "Podella, as a weekend visitor, [had] the authority to subject . . . Sobczak's home and its contents to a police search." (Emphasis added.) On the other hand, Sobczak concedes in his reply brief that he is no longer "assert[ing] an independent privacy interest in his computer" or "disput[ing] . . . Podella's authority to consent to its search." We are unsure as to how these two contentions can be reconciled. Nonetheless, in the interest of clarity and comprehensiveness, we will address the search.

Fourth Amendment and the exclusionary rule is therefore inapplicable.

¶30 Liberally construing Sobczak's argument on this point, we understand him to maintain that even if Podella had the authority to consent to the entry, she had no authority to consent to the far more intrusive search of the laptop. To substantiate that claim, Sobczak surveys a variety of cases in which a third party let an officer of the law into a home without inviting a search of the premises. Sobczak's conclusion that this collection of cases implies that short-term houseguests can never consent to searches is erroneous because his premise is flawed. That other courts have sanctioned entries without searches does not mean that any search following any such entry is unconstitutional. Indeed, the language of Matlock compels the contrary conclusion: "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it . . . may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171 (emphasis added) (footnote omitted). If, in a third-party consent case, the State must demonstrate that its inspection of the effects was constitutional in addition to its inspection of the premises, as Matlock teaches, it stands to reason that the State must demonstrate that it had consent to examine those effects. Here that means that after Podella consented to Officer Dorn's entry, an independent analysis must be performed to determine whether

she consented to a search of the laptop.  Cf. United States v. Karo, 468 U.S. 705, 726 (1984) (O'Connor, J., concurring) ("[W]hen a guest in a private home has a private container to which the homeowner has no right of access . . . the homeowner . . . lacks the power to give effective consent to the search of the closed container."); United States v. Fultz, 146 F.3d 1102, 1106 (9th Cir. 1998) (adopting quoted language from Justice O'Connor's concurrence in Karo); Commonwealth v. Porter P., 923 N.E.2d 36, 48 n.11 (Mass. 2010) ("Even if a coinhabitant of the home had actual authority to consent to a search of the home, the consent would not extend to a closed suitcase, overnight bag, or gym bag located inside the home that did not belong to the coinhabitant.") (citation omitted); United States v. Smairat, 503 F. Supp. 2d 973, 991 (N.D. Ill. 2007) (applying the principles above to computers).

¶31 To validate the search of an object within a home on consent, the government must satisfy the same requirements as apply to consent to enter, namely, that the consenter had "joint access or control" of the object "for most purposes."  See, e.g., United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005).  The question of whether Podella had sufficient access or control of the laptop for most purposes such that she was constitutionally entitled to allow Officer Dorn to search it is a far easier one than the question regarding his entry into the home.  Undisputedly, Podella was explicitly granted permission by Sobczak to use the laptop, and the record contains no intimations of Sobczak placing any parameters on that use.

Moreover, Podella used the computer in a common area of the house——the living room——which is where Officer Dorn conducted the search.  It is also relevant that Officer Dorn opened only those files to which Podella had called his attention; a more searching examination of the machine occurred only after a search warrant was obtained.  No one involved in the case has ever averred that the files inspected upon Podella's consent were password protected, and it is consequently safe to assume that they were accessible to anyone using the laptop.  We therefore have no difficulty in saying that Podella was authorized to consent to Officer Dorn's search of the laptop. See State v. Ramage, 2010 WI App 77, ¶¶7-18, 325 Wis. 2d 483, 784 N.W.2d 746 (upholding the search and seizure of a computer on consent offered by an individual who was allowed by the defendant to use the machine without password protection); see also United States v. Stabile, 633 F.3d 219, 233 (3d Cir.) (concluding that an individual had authority to consent to a search and seizure of the defendant's hard drives where the computer was used by both the consenter and the defendant, was not password protected, and was located in a common area), cert. denied, 565 U.S. __, 132 S. Ct. 399 (2011).  In short, the Fourth Amendment permitted Officer Dorn to search the files Podella had viewed on her consent.

¶32 It is important to underscore the limitations of today's decision.  As the court of appeals cautioned, "We are not holding that the girlfriend's status as a houseguest gave her carte blanche to consent to a search of all the contents in

28

the home. Rather, her authority to consent to a search was limited to the property that she possessed 'common authority' over." Sobczak, 338 Wis. 2d 410, ¶13. We agree. Officer Dorn went only into the living room, a common area of the residence, and searched only the laptop, an object Podella had been granted explicit permission to use. For present purposes, it is enough to say that Officer Dorn's entry and search complied with the dictate of the Fourth Amendment. Future courts should consider future cases with this sensitivity to detail in mind.

¶33 Because Podella had actual authority to consent, we need not——and do not——consider the other issues raised by the parties: apparent authority, the independent source doctrine, and the inevitable discovery doctrine. See State v. Cain, 2012 WI 68, ¶37 n.11, 342 Wis. 2d 1, 816 N.W.2d 177 ("In conformity with our prior practice, we choose to decide this case on the narrowest grounds possible . . . .") (citations omitted).

### V. CONCLUSION

¶34 Our Constitution obeys the "centuries-old principle of respect for the privacy of the home," Wilson, 526 U.S. at 610, and the state therefore may not intrude into a residence without a warrant unless it satisfies one of the few and narrowly-drawn exceptions to the warrant requirement. Welsh, 466 U.S. at 749. One exception permits the police to enter the home when the prosecution can persuade a court that the officer was invited to cross the threshold by someone authorized by the defendant to extend such invitations. Matlock, 415 U.S. at 171. At issue now is whether Podella had such authority when she invited law

29

enforcement to enter Sobczak's residence and view suspicious files on his computer.  The circuit court found that she did have that authority and accordingly denied Sobczak's motion to suppress, and the court of appeals agreed.  We agree with both the trial and appellate courts, and consequently affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶35  David T. Prosser, J., did not participate.

¶36 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority's opinion, and I agree with the majority's conclusion that the police actions in this case were not unconstitutional. I write separately to emphasize our consideration of Podella's authority to consent to the search of this portable laptop under the facts presented.

¶37 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." A violation occurs "when government officers violate a person's 'reasonable expectation of privacy.'" United States v. Jones, 565 U.S. __, 132 S. Ct. 945, 950 (2012) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The purpose of the Fourth Amendment is to curb abusive police practices by protecting against unreasonable searches and seizures. See Payton v. New York, 445 U.S. 573, 608 (1980) (White, J., dissenting). The police engaged in no such abusive practice in the case at issue. Under these facts and circumstances, law enforcement's entry into this house, with Podella's consent, and the search of this portable laptop computer survives constitutional scrutiny.

¶38 Homeowners would be justifiably disturbed if we were to conclude that an overnight guest possesses the authority to give carte blanche consent to a police search of their home. The majority opinion does not provide any such authority to an overnight guest, such as Podella. There is no dispute that

1

Podella possessed the authority to allow law enforcement to view the contents of this laptop computer. Here, evidence of child pornography was found on this portable laptop, which just happened to be viewed in the home. Podella requested that law enforcement view the laptop in the living room. The laptop could have been viewed anywhere. There is nothing about the laptop being in this home versus somewhere else that elevates the police entry under these circumstances to somehow being an unreasonable search and seizure. There is nothing in this record that indicates law enforcement was particularly interested in gaining entry of the home. Instead this record reflects that law enforcement was interested in viewing the laptop, wherever it may be viewed, and that Podella was interested in ensuring that they see the contents of the computer. Should the fact that law enforcement viewed the laptop in the living area of the home dictate that the evidence be suppressed, when it is undisputed that if the laptop were viewed at the police station, a coffee shop, or some similar location, no challenge would have been made to the search?[1]

¶39 A third party may consent to a search when that party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974) (emphasis

---

[1] If instead of finding child pornography, Podella was sexually assaulted by the defendant that morning and wished that law enforcement enter the home to take her statement, would her statement be suppressed under the logic that law enforcement had no authority to enter the home?

added).  In this case, the effect the police sought to inspect and did inspect was Sobczak's laptop computer.  Sobczak admits that he gave Podella permission to use the computer.  The majority opinion correctly concludes that Podella had consent to authorize Officer Dorn to search the files on the computer that she believed depicted child pornography.  See majority op., ¶32 (noting that Podella has explicit consent from Sobczak to use the computer, that she was using it in a common area of the house, that Officer Dorn opened only the files suspected to be child pornography, and that the files were not password protected).

¶40  In this case, law enforcement entered the home with the consent (and at the request) of Podella.  There is no evidence that law enforcement was trying to gain entry into the home for any reason other than to view the laptop's contents.  There is no indication that law enforcement otherwise wished to search the home or engage in conduct that in any way required them to gain entry to the home.[2]  Law enforcement entered the

---

[2] In contrast to the facts and circumstances of this case, a court will suppress evidence when law enforcement violates a homeowner's right to privacy by unreasonably searching a home and recovering evidence that is somehow tied to the home.  See e.g., State v. Stevens, 213 Wis. 2d 324, 326, 328-29, 570 N.W.2d 593 (Ct. App. 1997), aff'd, 217 Wis. 2d 518, 580 N.W.2d 688 (1998) (suppressing cocaine and a gun recovered from the defendant's bedroom where police attempted a ruse of a pizza delivery to gain entry into the defendant's home and when that failed, entered the defendant's home without knocking and announcing); State v. Sanders, 2008 WI 85, ¶¶13-15, 26, 311 Wis. 2d 257, 752 N.W.2d 713 (suppressing cocaine found in a canister underneath defendant's bed after police entered defendant's home without a warrant, arrested the defendant, and conducted two searches of the defendant's bedroom after the arrest).

3

main living area of the home with consent to view a portable laptop. Podella, not the homeowner, consented to Officer Dorn entering into the common living area, which was approximately 20 feet from the front door, in order to view the suspicious videos on Sobczak's computer. After doing so, Officer Dorn took the laptop to the police station. See majority op., ¶¶4-5. While law enforcement did view the computer in the home, law enforcement did not otherwise search the home. In fact, the police later obtained a search warrant to justify a search of Sobczak's home.

¶41 As a practical matter, the object of the search——Sobczak's laptop computer——was a portable object that Podella could have brought to Officer Dorn for him to view. In the case at hand, we are confronted with scrutinizing law enforcement's conduct in a constitutional sense when Podella consented to the search of this portable object in the common area of this home. We face this challenge because law enforcement viewed the laptop in the home instead of elsewhere. See majority op., ¶28 ("There can be no doubt that 'the Fourth Amendment has drawn a firm line at the entrance to the house,' and it is our duty to zealously guard that line.") (quoting Payton, 445 U.S. at 590). We are not confronted with a situation where the police used the pretext of searching a laptop to gain entry into a home. A person has a highly-protected expectation of privacy when it comes to law enforcement entering his or her home. There is no evidence in the record that suggests the police conducted a

broader search than was necessary to determine whether the files Podella found on Sobczak's computer were child pornography.

¶42 In short, I join the majority's opinion, and I agree with its conclusions that the police actions in this case were constitutional. Here, a constitutional challenge would not have been brought had the laptop been viewed in a myriad of other places. Under these facts and circumstances, Podella possessed sufficient authority to allow the police to enter the home in order to conduct a search of the laptop.

¶43 For the reasons set forth, I respectfully concur.

¶44 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* "When it comes to the Fourth Amendment, the home is first among equals."[1] The rule is that a law enforcement officer who enters a residence without a warrant is engaging in an unconstitutional act. Courts have, however, "jealously and carefully drawn"[2] exceptions to the rule, one of which posits that an individual possessing appropriate authority may voluntarily "consent" to the entry and search of a residence.[3] Exceptions to the warrant requirement, such as voluntary consent, are construed narrowly because warrants are generally preferable to police action without a warrant.[4]

¶45 The question presented in the instant case is: Can a weekend guest in a residence call the police and authorize a search of a living room and computer while the resident is at work? Or is such a search a violation of the resident's

---

[1] <u>Florida v. Jardines</u>, ___ U.S. ___, 133 S. Ct. 1409, 1414 (2013).

[2] <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958).

[3] <u>Georgia v. Randolph</u>, 547 U.S. 103, 106, 109 (2006) (citing <u>United States v. Jones</u>, 357 U.S. 493, 499 (1958)); <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990)).

"'[O]ur law holds the property of every man so sacred, that no man can set foot upon his neighbour's close without his leave.' 2 Wils. K.B., at 291, 95 Eng. Rep., at 817. . . .' [T]he only question is whether he had given his leave (even implicitly) for them to do so." <u>Jardines</u>, 133 S. Ct. at 1415.

[4] <u>Randolph</u>, 547 U.S. at 117.

1

constitutional rights under the Fourth Amendment to the United States Constitution?

¶46  In other words, when is a person authorized under the law to invite law enforcement into someone else's residence or to allow law enforcement to search someone else's computer?[5]

¶47  The majority rules that a one-time weekend guest can consent to a search of the living room of the residence and the resident's computer.  Yet the majority points to no case in any jurisdiction holding that a weekend guest under the circumstances of the present case may validly consent to a search of another's residence.[6]

---

[5] No exigent circumstances existed in the present case justifying a warrantless search of the residence or the computer.  There was plenty of time for law enforcement to get a warrant.  For a discussion of when exigent circumstances may justify a warrantless search, see Missouri v. McNeely, ___ U.S. ___, 133 S. Ct. 1552 (2013).

[6] The majority opinion discusses many cases as a basis for its holding.  In not one of these cases did the court rule that a non-resident had actual authority to consent to a search of a residence.

In State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998), this court held that the defendant's father-in-law lacked actual and apparent authority to consent to a search of a loft area above the father-in-law's garage, where the defendant and his wife were living.

In Chapman v. United States, 365 U.S. 610 (1961), a landlord did not have actual authority to consent to a search of a tenant's home.

2

In <u>Commonwealth v. Lopez</u>, 937 N.E.2d 949, 958 (Mass. 2010), an unknown woman who opened the door of the defendant's home had neither actual nor apparent authority to consent to a search. Although the Commonwealth conceded the unknown woman did not have actual authority, the Massachusetts court noted that a cohabitant is a "person who <u>lives in the home</u>, either as a member of the family, a roommate, or a houseguest whose stay is of <u>substantial duration</u> and who is given full access to the home," and that this cohabitant <u>may</u> have actual authority to consent to a warrantless search. <u>Lopez</u>, 937 N.E.2d at 956-57 n.9 (quoting <u>Commonwealth v. Porter P.</u>, 923 N.E.2d 36 (Mass. 2010)).

In <u>United States v. Sanchez</u>, 608 F.3d 685, 687 (10th Cir. 2010), the United States Court of Appeals for the Tenth Circuit held that the homeowner's 15-year-old daughter who lived in the home had actual authority to consent to a search of the home.

In <u>Davis v. State</u>, 422 S.E.2d 546, 549 (Ga. 1992), a 10-year-old child who lived in the residence did not have sufficient authority to consent to a search of his parents' home.

In <u>State v. St. Martin</u>, 2011 WI 44, ¶2, 334 Wis. 2d 290, 800 N.W.2d 858, <u>cert. denied</u>, 565 U.S. ___ (2012), this court held that a co-tenant's consent is valid as against the absent, non-consenting co-tenant (citing <u>United States v. Matlock</u>, 415 U.S. 164, 170 (1974)).

In <u>United States v. Collins</u>, 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007), a wife and son who occupied the home with their husband/father, the defendant, and had a "close personal and familial relationship with" the defendant, had actual authority to consent to a search of their home, where the defendant's computer was located (citing <u>United States v. Duran</u>, 957 F.2d 499, 504-05 (7th Cir. 1992) (holding that "a spouse presumptively has authority to consent to a search of all areas of the homestead . . ."); <u>see also</u> <u>United States v. Ladell</u>, 127 F.3d 622, 624 (7th Cir. 1997) ("A third-party consent is also easier to sustain if the relationship between the parties——parent to child here, spouse to spouse in other cases——is especially close.").

3

¶48 The cases regarding consent to search a residence present a wide variety of consenting persons, including a landlord, an unknown guest, a resident 15-year-old child, a

---

In United States v. Groves, 530 F.3d 506, 510 (7th Cir. 2008), a co-occupant had actual authority to consent to a search when she lived in the residence; registered the residence's phone in her name; registered her daughter for school using the residence's address; kept clothes, mail, bills, and drugs at the residence; cleaned the residence; and had a key and unlimited access to the residence.

In United States v. Kim, 105 F.3d 1579, 1580-83 (9th Cir. 1997), an employee had actual authority to consent to a search of his employer's rented storage locker when the employee had been hired to lease the locker and the lease was in the employee's name while the employer's name was listed only as an additional person authorized to access the unit.

In State v. Vinuya, 32 P.3d 116, 132 (Haw. 2001), the defendant's mother, who owned and resided in the home with the defendant, could consent to a search of most of the home, but did not have actual authority to consent to a search of the defendant's locked bedroom.

In United States v. Cos, 498 F.3d 1115, 1117-18 (10th Cir. 2007), a woman whom the defendant was dating did not have actual or apparent authority to consent to a search of the defendant's home. The woman had spent the night on multiple occasions and had been alone in the apartment when the defendant went out, but did not have a key, did not live there, did not pay rent, was not named on the lease, and did not keep any personal belongings in the apartment. In Cos, the Tenth Circuit concluded that the "girlfriend" did not have "mutual use" or "joint access" because she could not enter the apartment without the defendant's consent. She was "more like an occasional visitor whom [the defendant] allowed to visit, rather than one who asserted a right to access the property jointly with [the defendant]." Cos, 498 F.3d at 1127.

More importantly, the Cos court recognized that a short-term dating relationship is not the equivalent of the relationships that establish a presumption of control: those between parent and child and between husband and wife. Cos, 498 F.3d at 1128.

4

resident 10-year-old child, a non-married co-resident, a resident spouse, a resident adult child, and a non-resident houseguest of short duration. Yet none of these cases provides support for the majority's conclusion.

¶49 In United States v. Matlock, 415 U.S. 164, 171 (1974), the United States Supreme Court set forth the test applicable to all consenting persons, explaining that consent depends on "common authority" and rests "on mutual use of the property by persons generally having joint access or control for most purposes" or some "other sufficient relationship to the premises."[7]

¶50 The United States Supreme Court has also explained that a court must examine the circumstances of the consent to determine whether a consenting party is authorized by law to give consent[8] or whether the consent is sanctioned by the "commonly held understanding about the authority of co-

---

[7] "The [United States Court of Appeals for the] Ninth Circuit has summarized post-Matlock cases as requiring that 'a consent-giver with limited access to the searched property lacks actual authority to consent to a search. . . . The cases upholding searches generally rely on the consent-giver's unlimited access to property to sustain the search.'" Braskett v. Fender, 884 F. Supp. 2d 1119, 1130 (D. Ore. 2012) (quoting United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997)).

[8] For example, a landlord may be able to show the police a written lease agreement allowing the landlord to enter the residence for any purpose and to permit others to enter the residence.

inhabitants"[9] or by "widely shared social expectations."[10]  In consent cases, "widely shared social expectations" are "naturally enough influenced by the law of property, but not controlled by its rules."[11]

---

[9] Randolph, 547 U.S. at 111.  The Randolph court, 547 U.S. at 109 n.2, explained its use of the word "co-inhabitants" as follows:  "Mindful of the multiplicity of living arrangements, we vary the terms used to describe residential co-occupancies. In doing so we do not mean, however, to suggest that the rule to be applied to them is similarly varied."

[10] Randolph, 547 U.S. at 111.

[11] Id.

For a discussion of the role of both property law and privacy law in interpretation of the Fourth Amendment, see Florida v. Jardines, ___ U.S. ___, 133 S. Ct. 1409 (2013).  In Jardines, the United States Supreme Court ruled that police conducted an illegal search within the meaning of the Fourth Amendment when, without a warrant, they used a police dog on the porch of a home to sniff for drugs inside the home.

Five justices in Jardines relied on property law.  The majority decision, written by Justice Scalia, explained that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment . . ."(emphasis in original).  The Jardines Court also discussed its recent decision in United States v. Jones, ___ U.S. ___, 132 S. Ct. 945, 948-52 (2012), explaining that "[in Jones], we held that tracking the vehicle's movements was a search: a person's 'Fourth Amendment rights do not rise or fall with the Katz formulation.'".  Jardines, 133 S. Ct. at 1417 (quoting Jones, 132 S. Ct. at 951-52).

Justice Kagan, joining the Scalia opinion and separately concurring with two justices, explained that property and privacy concepts mostly align in Fourth Amendment cases, writing, "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."

6

¶51 The application of the Matlock test and the Randolph "widely shared social expectations" test enables a court to determine whether it is reasonable to hold that the consenting party has the authority to consent in his or her own right and that the resident has "assumed the risk" that the consenting party might permit the common area or personal effect to be searched.[12]

¶52 There are no statutes or case law in Wisconsin applicable to the present case declaring that a weekend guest of limited duration has authority to consent to a search of another's residence.[13] So how do we apply the concepts of "common authority," "widely shared social expectations," and the resident's assumption of the risk in the present case?

¶53 We have no polls or social science research to advise us that, according to "widely shared social expectations," a weekend houseguest under the circumstances of the present case

---

Justice Kagan went on to explain, "The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions. And so the sentiment 'my home is my own,' while originating in property law, now also denotes a common understanding——extending even beyond that law's formal protections——about an especially private sphere." Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring) (citations omitted).

[12] Randolph, 547 U.S. at 111 (quoting United States v. Matlock, 415 U.S. 164, 171, n.7 (1974)).

[13] In the two opportunities this court has had to consider consent by a non-resident, this court has concluded that the non-resident did not have actual authority to consent. State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998); State v. McGovern, 77 Wis. 2d 203, 252 N.W.2d 365 (1977) (a person living in a tent on the grounds of the residence did not have authority while in the residence to consent to entry in the residence).

may consent to a search of the residence or a computer. Do the houseguest and the resident have "common authority" over the residence or the computer, that is, do they have "mutual use of the property because they have joint access or control for most purposes"?[14] Did the resident (here the defendant) assume the risk of the houseguest's inviting law enforcement into the residence to search it or the computer?

¶54 Case law sets forth a number of facts for courts to consider when determining the authority of a third party to consent to a search of the residence of another. The validity of the search of the residence or the computer based on third-party consent requires an intensely fact-specific inquiry, and slight variations in the facts may cause the results to vary.[15] The inquiry into the validity of a consensual search is based on

---

[14] Although Professor LaFave recognizes that a guest may consent to a search in certain circumstances, he explains:

> [A] host and guest cannot be said to have 'common authority' over the premises, in the sense in which that phrase is used in Matlock. Generally, it must be concluded that the host's interest in the premises and authority to permit a search of them is superior to that of the guest. This being so, it may be said that ordinarily a mere guest in premises may not give consent to search of those premises which will be effective against the superior interest and authority of the host.

4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.5(e) (5th ed. 2012) (citing United States v. Cos, 498 F.3d 1115 (10th Cir. 2007); People v. Wagner, 304 N.W.2d 517 (Mich. App. 1981); State v. Manns, 370 N.W.2d 157 (Neb. 1985)).

[15] United States v. Shelton, 337 F.3d 529, 535 (5th Cir. 2003). See also note 11, supra.

considerations of both property law and the invasion of privacy.[16]

¶55 I have examined Wisconsin case law, federal case law, and the case law of other states to list the factors courts examine to determine whether and when a third party has authority to consent to a search of a residence, that is, what facts persuade a court to conclude that a third party fits widely shared social expectations that he or she has authority to consent.

¶56 The following list of factors is not exclusive or exhaustive. The factors examine the characteristics of the

---

[16] In Shelton, 337 F.3d at 535-36, the court discussed viewing consent through the prism of the law relating to privacy as follows:

> Although consent to a search is a well-established exception to the requirement for a warrant issued on the basis of probable cause, courts have left the theory underlying this rule largely unarticulated. The validity of a consensual search is presumably based on the premise that a warrant and probable cause are unnecessary to justify the invasion of privacy that accompanies a consensual search, because by consenting, the individual evinces a voluntary willingness to forgo that privacy. Similarly, third party consent presumably extends the capacity to give consent to individuals to whom the one with the privacy interest has already substantially ceded his expectation of privacy. . . .

> Viewing third-party consent through the prism of privacy interests enables us to approach the question of common authority by asking whether A sufficiently relinquished his expectation of privacy to B, i.e., allowed mutual or common use of the premises to the extent of joint access and control for most purposes, so that it is reasonably anticipated that B might expose the same privacy interest to others, even including law enforcement officers (emphasis added).

9

consenting party and the consenting party's relationship to the resident and to the residence to answer the ultimate question from Matlock, namely whether the consenting party had "mutual use of the property" and is a person "generally having joint access or control for most purposes."

(1) Does the consenting person possess a key to the residence?[17]

(2) Does the consenting person live in the residence?[18]

(3) Does the consenting person claim to be living in the residence?[19]

---

[17] State v. St. Martin, 2011 WI 44, ¶18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).

The St. Martin test was taken from a longer list of factors laid out by the Seventh Circuit in United States v. Groves, in which the court examined 10 factors to determine whether a defendant's girlfriend had actual or apparent authority to consent to a search of the defendant's residence.

[18] State v. St. Martin, 2011 WI 44, ¶18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).

See also Commonwealth v. Porter P., 923 N.E.2d 36, 47-48 (Mass. 2010), explaining:

[A] person may have actual authority to consent to a warrantless search of a residence by the police only if (1) the person is a coinhabitant with a shared right of access to the residence, that is, the person lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home; or (2) the person, generally a landlord, shows the police a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence.

[19] United States v. Groves, 530 F.3d 506, 509-10 (7th Cir. 2008) (quoting United States v. Groves, 470 F.3d 311, 319 n.3 (7th Cir. 2006), for its list of factors).

10

(4) Does the consenting person have a driver's license listing the residence as the driver's legal address?[20]

(5) Does the consenting person receive mail and bills at the residence?[21]

(6) Does the consenting person keep clothing at the residence?[22]

(7) Do the consenting person's children reside at the residence?[23]

(8) Does the consenting person perform household chores at the residence?[24]

(9) Is the consenting person's name on the lease for the premises or does he or she pay rent?[25]

(10) Does the consenting person keep personal belongings such as a diary or a pet at the residence?[26]

(11) Is the consenting person allowed in the residence when the defendant is not present?[27]

---

[20] State v. St. Martin, 2011 WI 44, ¶18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858 (quoting Groves, 530 F.3d at 509).

[21] Groves, 530 F.3d at 509.

[22] Id.

[23] Id. at 509-10.

[24] Id. at 510.

[25] Id.

[26] Id.

[27] Id.

(12) Do the consenting person and the defendant have a relationship to each other or the residence that supports the conclusion that the person has authority to consent?[28]

(13) Is the duration of the consenting person's stay in the residence of sufficient length to support the conclusion that the person has authority to consent?[29]

---

In Groves, the defendant's girlfriend was a co-occupant who registered her daughter for school using the residence's address; registered the residence's phone in her name and paid the monthly bill; kept clothes, mail, bills and drugs in the residence; regularly cleaned the residence; and had a key and unlimited access to the residence.

[28] Thus, courts have recognized the authority of mature children, United States v. Sanchez, 608 F.3d 685, 687 (10th Cir. 2010); siblings, People v. Shaffer, 444 N.E.2d 1096 (Ill. App. Ct. 1982); spouses, United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997); United States v. Duran, 957 F.2d 499, 504-05 (7th Cir. 1992); United States v. Collins 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007); and occupants under certain circumstances, United States v. Turbyfill, 525 F.2d 57, 58-59 (8th Cir. 1975) (an "occupant of indefinite duration rather than a casual visitor" who "had the run of the house" could consent to a search of the residence).

[29] The guest has to stay for a "substantial duration" to be authorized to consent. Turbyfill, 525 F.2d at 58-59.

See also Commonwealth v. Porter P., 923 N.E.2d 36, 47-48 (Mass. 2010), explaining:

> [A] person may have actual authority to consent to a warrantless search of a home by the police only if (1) the person . . . [is] a houseguest whose stay is of substantial duration and who is given full access to the home . . . .

It is difficult to argue with a straight face that one or two nights is a substantial duration in anything but the life of a mayfly.

¶57 I consider all 13 factors, noting that the list is not exclusive or exhaustive, to determine whether, under Matlock, the consenting party had "mutual use of the property by persons generally having joint access or control for most purposes." Under the totality of the circumstances in the present case, I conclude that the houseguest did not have authority to give law enforcement consent to enter the residence.

¶58 The State has the burden to prove by clear and convincing evidence that a warrantless search was reasonable and in compliance with the Fourth Amendment.[30] Yet the State has failed to meet its burden to prove that the houseguest had actual authority to consent to a search because nothing in the record supports the majority's assertion that the defendant "must have envisioned [the houseguest's] 'mutual use of the property' and her possession of 'joint access or control for most purposes . . . .'" Majority op., ¶22. The record is distinguished by its singular lack of facts.

¶59 In the present case, the houseguest did not have any of the characteristics set forth in factors (1)-(10). As I stated previously, no precedent supports the majority's conclusion that this houseguest had actual authority to consent. She did not possess a key, live in the residence, claim to live there, have a driver's license with the residence's address, receive mail or bills at the residence, keep clothes there, have

---

[30] State v. Kieffer, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998).

13

her children or other relatives reside there, perform chores there, pay rent there, or keep personal belongings there.

¶60 When I look at factor (11), I conclude that the record shows that the houseguest here was alone in the residence for a few hours when the owner was not present one afternoon.[31]

¶61 With regard to factor (12), I note that courts have repeatedly reinforced the importance of the relationship between the defendant and the person consenting to the search in determining the authority of a consenting third party. The more distant the relationship, the more likely the resident has a reasonable expectation of privacy in relation to the third party and to spaces typically perceived as private.

¶62 In the present case, the nature of the relationship is not in the record. The majority opinion nonetheless assumes an intimate, romantic relationship. Indeed the entire majority opinion is premised on an intimate, romantic relationship supporting the inference that the houseguest was authorized to consent to others coming into the house.

¶63 In contrast to the majority opinion, the record merely indicates that the defendant and the houseguest had been

---

[31] The record does indicate that the defendant left sometime in the afternoon for his evening job as a bartender. The record indicates that Officer Dorn was dispatched to the residence at 5:32 p.m. Thus, the houseguest was alone in the residence from sometime in the afternoon when the defendant left for his evening job until Officer Dorn arrived at 5:32 p.m.

In this brief period of time in the afternoon between when the defendant left for his evening job and 5:32 p.m., the houseguest probably spent about an hour away from the residence walking to and from the nearest gas station to call her grandma.

14

"dating" for a few months. The parties' briefs describe the houseguest as the defendant's "girlfriend," but the officer testifying at the preliminary examination did not describe her as a girlfriend. The word "girlfriend" is not defined, and the relationship between the houseguest and the resident was not spelled out at the preliminary examination or in any part of the record or in the briefs. Very little evidence of the relationship is in the record from which inferences can be made.

¶64 I conclude the State has not met its burden of proof. Rather, the majority opinion has filled in the gaps in the State's proffered facts by imaginatively inferring an "intimate" romance without any proof in the record about the nature of the relationship.[32]

---

[32] The majority opinion indicates that the defendant and his guest were boyfriend and girlfriend, in a romantic, intimate relationship, which it argues is an important fact to support its finding that she had actual authority to consent to a search of at least part of the residence. Majority op., ¶¶2 n.1, 20 n.12, 22, 25, 28. The majority opinion uses the words "romantic" or "intimate" at least 15 times.

More properly, as the record reveals, the houseguest and the defendant met online, approximately three months earlier, and they had been "dating," an undefined term. The majority apparently assumes that a 22-year-old man is having a romantic, intimate relationship with a 20-year-old woman whom he invites over for the weekend while his parents are away.

According to the record, the houseguest lived in Kenosha and the defendant lived in Hartford, approximately a 90-minute drive apart. The houseguest apparently did not have a car or a phone while she was at the defendant's residence. The defendant had a bartending job which required him to work at night.

I infer from the facts that are in the record that the defendant and the houseguest had met at least one time before this fateful weekend because the defendant had a picture of himself with the houseguest as his computer background.

15

¶65 What is clear from the record is that the defendant and the houseguest did not have a relationship similar to those in cases in which courts have recognized that actual authority existed. The houseguest was not a member of the defendant's family, the defendant's spouse, an estranged spouse or a former spouse, the defendant's child or sibling, or the defendant's tenant or co-occupant or guest of substantial duration.

¶66 As to factor (13), the record is clear that the duration of the houseguest's stay in the residence was to be short, a weekend.[33]

¶67 A review of the 13 factors (and any other facts that were in the record) makes clear that the houseguest did not have "mutual use of the property by persons generally having joint access or control for most purposes." The guest had "access" to the residence for one purpose: to remain in the home on Saturday afternoon when the defendant went to work. As in United States v. Cos, 498 F.3d 1115, 1117 (10th Cir. 2007), the houseguest in the instant case was "more like an occasional visitor whom [the defendant] allowed to visit, rather than one who asserted a right to access the property jointly with [the defendant]."

---

The record does not state how many times the two had actually met in person before the weekend at issue, or how many "dates" they had. The record is silent about whether the houseguest had previously stayed at the defendant's residence.

[33] According to the record, the houseguest arrived at the defendant's residence on Friday and planned to leave on Sunday. She left, however, on Saturday after filing the complaint. The actual duration of her stay in the residence was one night and part of a day.

16

¶68 If we are discussing the extent of the houseguest's "control," the record is absolutely silent on whether she had any control whatsoever over the residence. Nothing in the record indicates that she could invite friends over or have them use any room she occupied or exercise authoritative or dominating influence over the residence, as a dictionary definition of "control" contemplates.[34] Any inferences regarding the extent of her control are improper. The record is absolutely silent on facts from which inferences of control can be made.

¶69 Any access and control of the houseguest in the present case was limited to the temporary access and control a weekend guest might have when invited to someone else's home to stay for a short time. The houseguest did not share "joint" access or control, which contemplates that she "shared" an interest or had a "common interest" in the residence. Any access or control the houseguest had to the residence was

---

[34] The majority opinion's discussion of the houseguest's control of the residence is itself internally inconsistent, making it clear that the majority does not really know how much control she had while providing poor guidance for future courts. At one point, the majority opinion takes a broad approach, explaining that "a weekend guest left in a home alone cannot legally sell the property, but it seems she can do a great deal else with it." Majority op., ¶23. Later, the majority opinion "underscore[s] the limitations of today's decision," explaining that the houseguest did not have "carte blanche" to consent to a search of all parts of the house. Majority op., ¶32.

All this leaves me perplexed. The houseguest apparently can do almost anything "with [the house]." The houseguest cannot, however, sell the house or consent to a search of certain parts of it. What about the bedroom where she slept or kept her clothes?

17

clearly inferior to that of the defendant, and not "joint" by any definition of the word. The use of the premises by the defendant and the houseguest could not be called "mutual" by any definition of that word.

¶70 In sum, all that can be gleaned from this evidence-deficient record is that a weekend houseguest described in the briefs as a girlfriend but of unknown relationship to the resident-defendant was given consent to use the defendant's computer and was left in the residence alone for a few hours on a Saturday afternoon while the resident-defendant was working. The record reveals nothing more.

¶71 This record does not support a reasonable inference that the houseguest has authority to consent to a law enforcement entry or search of the residence. No precedent supports the majority's conclusion that such a houseguest has authority to invite law enforcement officers into the home.

¶72 Under the majority opinion, it is easier for a weekend houseguest than for a co-resident to be accorded authority to consent to a search of another's residence. The majority opinion's rationale is illogical on its face and contravenes precedent.

¶73 In Illinois v. Rodriguez,[35] the United States Supreme Court concluded that a former girlfriend, who had previously lived in the defendant's apartment and still occasionally spent the night and had a key, did not have actual authority to

---

[35] Illinois v. Rodriguez, 497 U.S. 177 (1990).

18

consent to a search of the apartment.[36] The consenting third party in Rodriguez has a stronger connection to the resident and to the residence than the consenting third party in the present case, yet this court reached a different conclusion than the United States Supreme Court.

¶74 The Rodriguez case has been cited favorably numerous times, including in the recent United States Supreme Court decision in Randolph v. Georgia.[37] Yet the majority simply rejects the Supreme Court's holding as "cursory". Majority op., ¶17. Justice Scalia may be amused to learn that the majority of justices of the Wisconsin Supreme Court characterizes his measured and deliberate approach in Rodriguez as "cursory" and refuses to recognize it as a binding interpretation of the Fourth Amendment of the United States Constitution. The simple fact that the United States Supreme Court reached multiple conclusions in Rodriguez and chose to spend more time explaining the doctrine of apparent authority rather than actual authority

---

[36] Id., 181-82.

[37] Randolph, 547 U.S. at 106, 109.

does not diminish the importance of its holding about actual authority and does not permit us to ignore its holding.[38]

¶75 In Rodriguez, police were called to the residence of Dorothy Jackson. There, police were met by Ms. Jackson's daughter, Gail Fischer, who showed signs of a severe beating and indicated she had been assaulted by Edward Rodriguez, who Fischer believed was asleep in his apartment.[39] Fischer consented to travel to the apartment with the police in order to unlock the door for them with her key. Police learned that Fischer referred to the residence as "our" apartment, had a key, and had clothes and furniture there. It is unclear whether Fischer told the police that she currently lived in the apartment, but in fact she had lived there for six months with her two small children and Rodriguez and had moved out a few

---

[38] As the majority opinion explains in ¶18 n.10, the Rodriguez court applied the Matlock test in holding that the guest had no actual authority to consent to the search. The Rodriguez decision directly quotes the Matlock test, explaining that "the State has not established that . . . [the houseguest] had 'joint access or control for most purposes.'" Rodriguez, 497 U.S. at 181-82. Nevertheless, the majority opinion asserts that the Rodriguez result is "incompatible" with the Matlock test. Majority op., ¶18 n.11. How does tension exist between Matlock and Rodriguez, as the majority opinion asserts, when one United States Supreme Court decision directly relies on the standard put forth in another? The majority opinion attempts to resolve a nonexistent tension, never distinguishing the facts of Rodriguez from those in the present case for purposes of deciding the authority of the houseguest.

[39] Fischer indicated that the assault had occurred earlier in the day. The United States Supreme Court opinion does not indicate whether Fischer had spent the previous night in the apartment or the number of hours she spent in the apartment that day.

weeks earlier. Even after she moved out, Fischer occasionally spent the night at Rodriguez's apartment.[40]

¶76 The question posed to the high court in Rodriguez was whether Fischer had actual or apparent authority to consent to the search of Rodriguez's apartment. Justice Scalia addressed the issue and relied on the Matlock test, that is, there is authority to consent when there is "common authority" that rests "on mutual use of the property by persons generally having joint access or control for most purposes."[41] Justice Scalia, writing for the Rodriguez Court, concluded that on the basis of the record it was clear that the State had not met its burden of establishing that Fischer had common authority over the residence.[42]

¶77 Although Fischer had a key, had previously lived in the residence with her children, had clothes and furniture there, and occasionally spent the night there after moving out, the Court ruled that Fischer did not have "joint access or control for most purposes." After this thorough explanation, Justice Scalia concluded that the lower courts' determination of no common authority over the apartment was "obviously correct."[43] Once Fischer no longer resided there she became a temporary guest without common authority, like the houseguest in the

---

[40] Rodriguez, 497 U.S. at 179-82.

[41] Id. at 181 (quoting United States v. Matlock, 415 U.S. 164, 171, n.7 (1974)).

[42] Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990).

[43] Rodriguez, 497 U.S. at 181-82.

21

present case. The Court then moved to the issue of apparent authority, an issue not presented in the instant case.

¶78 The facts in Rodriguez and the present case are similar: Both Fischer and the houseguest here called the police to report a crime. Both let the police into the residence in which they did not live. Although Fischer had a greater attachment to the apartment, had a closer relationship to the defendant, had a key, and had spent a longer time in the apartment than the houseguest in the present case, the United States Supreme Court held that Fischer did not have actual authority to consent to the search.

¶79 Following Rodriguez, federal and state courts alike have held the line, refusing to recognize that temporary guests, without more, have actual authority to consent. Professor LaFave explains that "[t]here is sound authority that, at least when the guest is more than a casual visitor and 'had the run of the house,' his lesser interest in the premises is sufficient to render that limited consent effective."[44] Professor LaFave takes the "run of the house" language from United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975). In Turbyfill, the United States Court of Appeals for the Eighth Circuit held that an "occupant of indefinite duration rather than a casual visitor" who "had the run of the house" could consent to a search of the residence.[45]

---

[44] 4 Wayne R. LaFave, supra note 14, at § 8.5(e) (emphasis added).

[45] Turbyfill, 525 F.2d at 58-59.

22

¶80 Although the majority opinion attempts to offer "something more" for the houseguest in the present case to render her more than a casual visitor for a limited duration, the majority opinion's "offer" is something far less than what existed in Turbyfill and Rodriguez, and the "something more" that other courts have carefully required.

¶81 In United States v. Cos, 498 F.3d 1115 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit recognized that a relationship between a man and a woman who "had dated for a short time" is not the equivalent of relationships that establish a presumption of control: those between parent and child and between husband and wife.[46]

¶82 In Cos, a guest who had been dating the tenant and was possibly living with him, and clearly had spent the night and had been left alone in the apartment on multiple occasions, did not have actual nor apparent authority to consent to a search when police arrived while she was in the apartment in the tenant's absence.[47]

¶83 The Tenth Circuit concluded that the guest was "more like an occasional visitor whom [the defendant] allowed to visit, rather than one who asserted a right to access the property jointly with [the defendant]."[48] The facts of Cos are substantially similar to the facts of this case, and the Tenth

---

[46] Cos, 498 F.3d at 1128.

[47] Id. at 1117-18.

[48] Id. at 1127.

23

Circuit's definition of the guest who cannot consent matches the houseguest in the present case.

¶84 When the analysis turns to the search of the defendant's laptop, I agree with the majority opinion that "an independent analysis must be performed to determine" whether the houseguest had authority to consent to a search of the defendant's laptop. Majority op., ¶¶30-31. In contrast to the position taken by the concurrence, the majority opinion and I agree: "Courts must independently consider whether a third party has the authority to consent to a search of a residence and whether the third party has authority to consent to particular containers within that residence."[49] A computer has long been analogized to a closed container for Fourth Amendment purposes.[50] Authority to consent to search a room does not necessarily extend to authority to consent to search closed containers within that room.[51]

¶85 "A valid consent to search the closed container must come from one who has common authority over the effects sought

---

[49] United States v. Smairat, 503 F. Supp. 2d 973, 987 (N.D. Ill. 2007) (citing Groves, 470 F.3d at 320).

[50] See, e.g., United States v. Blas, 1990 WL 265179, *21 (E.D. Wis. 1990) ("[A]n individual has the same expectation of privacy in a pager, computer or other electronic data storage and retrieval device as in a closed container . . . .")

[51] Smairat, 503 F. Supp. 2d at 987 (citing Rodriguez, 888 F.2d at 523).

to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes."[52]

¶86 Without precedent or analysis, the concurrence asserts that "it is undisputed" that the defendant's laptop could be searched wherever police like "in a myriad of other places." Concurrence, ¶¶38, 42.

¶87 The concurrence turns a blind eye to the Fourth Amendment's prohibition of unreasonable searches not only of "persons [and] houses," but also of "papers and effects." The defendant's computer is one of the defendant's effects. The Fourth Amendment protects the contents of a computer from government intrusion whether the computer is found inside or outside the home.

¶88 A computer is not just another container. It is more like a filing cabinet or safe ordinarily containing substantial personal data.[53]

---

[52] United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005) (citing United States v. Karo, 468 U.S. 705, 725-26 (1984) (O'Connor, J., concurring)).

[53] Judge Posner recently wrote:

Judges are becoming aware that a computer (and remember that a modern cell phone is a computer) is not just another purse or address book. '[A]nalogizing computers to other physical objects when applying Fourth Amendment law is not an exact fit because computers hold so much personal and sensitive information touching on many private aspects of life. . . . [T]here is a far greater potential for the 'inter-mingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer.' . . . At the touch of a button a cell phone search becomes a house search, and that is not a search of a 'container' in any normal sense of that word, though a house contains data.

25

¶89 Law enforcement needs a valid exception to the warrant requirement to engage in a warrantless search of the contents of the computer. The only exception applicable to the computer in the present case is consent. No other Fourth Amendment exception applies.

¶90 Therefore, when addressing whether the houseguest had actual authority to consent to a search of the computer inside or outside the home, the court must complete a consent analysis specifically applicable to the computer. The majority opinion does so in vain, but the concurrence believes it need not even go through the motions.

¶91 In State v. Carroll, 2010 WI 8, 322 Wis. 2d 299, 778 N.W.2d 1, this court addressed whether police could search the contents of a cellular telephone incident to arrest after noticing an image on the screen that appeared to include illegal drugs. Our court held that law enforcement cannot search a cellular telephone (a personal electronic device) without a

---

United States v. Flores-Lopez, 670 F.3d 803, 805-06 (7th Cir. 2012) (internal citations omitted).

    See also Smallwood v. Florida, 2013 WL 1830961, *7, ___ So. 3d ___ (Fla. 2013) ("The most private and secret personal information and data is contained in or accessed through small portable electronic devices and, indeed, many people now store documents on their equipment . . . that, twenty years ago, were stored and located only in home offices, in safes, or on home computers.").

warrant when there is no immediate danger of the data disappearing before a warrant can be obtained.[54]

¶92 Thus, the concurrence ignores the established precedent of this court, which requires law enforcement to get a warrant to search a personal electronic device when no valid exception to the warrant requirement applies.

¶93 The ultimate question is whether the houseguest shared "joint access or control" of the computer "for most purposes." From the limited record, all we know is that the houseguest was permitted to use the defendant's computer on the fateful afternoon "because she was bored and wanted something to do." The computer belonged solely to the defendant, and the defendant and the houseguest did not generally share common authority over it. We do not know whether the defendant provided any parameters on its use.

¶94 The State has not demonstrated that the defendant "assumed the risk" that the houseguest who had authority to use the computer also had authority to open every single file on the computer, including those containing child pornography, personal financial records, health information, or other confidential data.

¶95 For the same reasons that I conclude that the houseguest did not have actual authority to consent to the

---

[54] State v. Carroll, 2010 WI 8, ¶33, 322 Wis. 2d 299, 778 N.W.2d 1 (citing Arkansas v. Sanders, 442 U.S. 753 (1979) (Officers with probable cause to believe a suitcase contained contraband were justified in seizing that suitcase, but the Fourth Amendment precluded their immediate search of the suitcase without a warrant.)).

27

search of the home, I conclude she also did not have actual authority to consent to the search of the contents of the computer. The State has failed to meet its burden to prove that the houseguest had actual authority to consent to a search of private computer data. The State did not prove that the defendant "assumed the risk" that the houseguest would access his personal files on the computer and invite the police to join her any more than he would assume the risk that she would open desk drawers just because she could use the surface of the desk.

¶96 This court's decision today disregards Wisconsin and United States Supreme Court precedent and rulings in other jurisdictions.

¶97 For the reasons set forth, I dissent.

¶98 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

28